**STATE of Tennessee, Appellee,**

v.

**Evay Markel KELLEY, Appellant.**

Court of Criminal Appeals of Tennessee, at Knoxville.

Feb. 28, 2000.

Application for Permission to Appeal Denied by Supreme Court Nov. 20, 2000.

Martin J. Levitt and Lloyd A. Levitt, at trial, Ardena J. Garth, District Public Defender and Donna Robins Miller, Assistant Public Defender, on appeal, Chattanooga, TN, for appellant.

Paul G. Summers, Attorney General of Tennessee and Clinton J. Morgan, Counsel for the State, Nashville, TN; William H. Cox, III, District Attorney General and Yolanda D. Mitchell, Assistant District Attorney, Chattanooga, TN, for appellee.

## OPINION

JOSEPH M. TIPTON, Judge.

The defendant, Evay Markel Kelley, appeals as of right from his conviction by a jury in the Hamilton County Criminal Court for second degree murder, a Class A felony. The trial court sentenced the defendant to twenty-five years in the Department of Correction without parole pursuant to Tenn.Code Ann. § 40–35–501(i). The defendant contends that the evidence is insufficient to support his conviction and that his sentence is excessive. We affirm the judgment of conviction.

The defendant was indicted for first degree murder for the August 8, 1997, shooting death of Todd Peterson. At trial, Chasity McGuire testified that she was the victim's girlfriend and was with him on the night he was killed. She said that after shopping at Wal–Mart around 10:30 or 11:00 p.m, she and the victim went to the Brainerd Road Waffle House, where they both worked, to see who was there. She said they decided to go see Charlie McClendon, the victim's friend. She said that Mr. McClendon was expecting them. Ms. McGuire's testimony revealed that the victim was driving her car and that she was riding in the passenger seat. She said the victim decided to stop at a pay telephone across from Mr. McClendon's house and call first because it was late. She admitted that they did not use any of the numerous pay telephones that they passed on the way to Mr. McClendon's house, but she said that they did not decide to call Mr. McClendon until they were almost there. She said she did not see any lights on in Mr. McClendon's house.

Ms. McGuire testified that the victim stopped close to the telephone in order to reach it from the car. She said several men and women were standing on the corner. She said the victim was looking for change when three men approached the car. She said the closest one stood by the driver's side mirror and was about six feet tall, wearing a black shirt and black pants. She said one of the men asked for a cigarette, and the victim gave him one. She said she did not know these men, nor did the victim act as though he knew them. She said the men asked the victim if she were his "old lady," and the victim said yes. She said the men said something else that she did not understand, and the victim replied that he was looking for Mr. McClendon. She said the man standing closest to the car said that Mr. McClendon was at home. She said the victim hung up the telephone.

Ms. McGuire testified that the closest man grabbed the driver's side door and opened it. She said the victim tried to close it, but another man also grabbed the door. She said the two men could not get the door completely opened because a pole next to the telephone was in the way. She said the victim put the car in reverse and began backing up while holding onto the door. She said they were probably one to one and one-half car lengths away when she heard gunshots and saw an explosion from a gun. She stated that the man who had been standing closest to the car was the shooter. She said she believed that the shooter emptied the gun at the car.

Ms. McGuire testified that she ducked and saw the victim's hands fall from the steering wheel. She said she sat up and saw blood. She said she sat on the console, put her leg over the victim's, and slammed on the brakes. She stated that she turned the car around in someone's yard and drove to the hospital. She said the whole incident took place in a matter of minutes. She said the victim did not have a dispute with the men nor did he have a weapon.

Charles McClendon testified that the victim was his best friend and that he lived across the street from the pay telephone. He stated that his telephone was disconnected on August 8, 1997. He said that the night before, he and the victim had made plans to visit their friends, the Sinclairs, the next evening. He said that he had not told the victim that his telephone was disconnected, and he had tried to reach the victim that day through Chasity McGuire's pager. He said that when he returned from the mall on the evening of August 8, he went to the pay telephone to call the Sinclairs to see if they had heard from the victim. He said the defendant spoke to him while he was using the telephone. He said that later that night, he heard three gunshots. He said he went to his door and saw a car go into the neighbor's yard. He said he had mistakenly told an investigator that he saw the defendant limping that night.

Mr. McClendon testified that the victim bought some cigarettes from Dante Peoples and his associates on the day before the day of the shooting. He said he warned the victim not to socialize with these people because they were known to sell drugs and carry guns. He said he did not know why the victim had gone to the pay telephone to call him that night. He stated that the victim had been to his house on other occasions. He said he had told the victim to knock or to blow the horn when the victim came to his house.

Jasmine Patillo testified that she witnessed a shooting on August 8, 1997, and that she was eleven years old at the time. She said she was walking with her friend Quantana around 7:00 or 8:00 p.m., and Quantana stopped in front of a store to talk to her boyfriend, the defendant. She said she told the defendant that he should take off his sunglasses, and the defendant hit the back of her head with his gun. She said a car pulled up to the pay telephone. She said the driver could not have reached the telephone from the car. She said the defendant and two other men, whom she knew as Pooh and Bedo, walked from the front of the store over to the telephone. She said the three were standing in front of the driver's side door and talking with the people in the car. She said she heard one of the three say, "Do you have any money?"

Ms. Patillo testified that she and Quantana were about to leave when Dante walked over to the car and asked the occupants if they wanted to buy some cigarettes. She said she and Quantana walked away and got about two houses down when she heard three gunshots. She said she and Quantana started running up the street with the defendant, Dante, and the other men. She stated that she, Quantana, Dante, and the defendant ran to Dante's house. She said that as soon as they went inside, the defendant hid his gun under the couch. She said she asked the

defendant why he shot, and he replied that it was because the man ran over his foot. She said the defendant did not complain that his foot was hurting, and she did not see anything to indicate that his foot was injured. She said the defendant told her that he thought he might have hit the woman in the car because she screamed but that he was not sure. Ms. Patillo testified that later that morning, the defendant and Dante went to a Krystal Restaurant. She said she was asleep when they returned and when the police arrived.

Ms. Patillo testified that she was aware that drug dealing took place on the corner near the pay telephone. She admitted that she told the police that she saw the defendant fire the shots. She said that this statement was not true and that she was nervous when she gave it. She said that her back was to the telephone at the time of the shooting. She admitted that she was not paying attention to what was going on at the time of the incident.

Tommy Woods, a homicide detective with the Chattanooga Police Department, testified that at 12:50 a.m. on August 8, 1997, he learned that the victim was dead upon arrival at the hospital. He said he went to the crime scene on the corner of Ridgeside and Gillespie. He said that around 4:00 or 5:00 a.m., his investigation led him to the home of Dante Peoples at 3601 Ridgeside. He stated that the owner of the house consented to a search and that he found the defendant, Mr. Peoples, Quantana Penn, and Jasmine Patillo in a back bedroom. He said he also found a nine millimeter automatic weapon with nine bullets in the clip and a substance that he suspected was crack cocaine.

Detective Woods testified that he interviewed the defendant at the Chattanooga Police Department's service center at 9:15 a.m. He said the defendant waived his rights and gave a statement. The statement provides the following: The defendant was standing with three other people by the pay telephone. The telephone rang, and the defendant answered it. He was talking with the caller, whom he did not know, when a car with a white male driver and a white female passenger neared the pay telephone. The driver asked to use the telephone, but the defendant told the driver that he was using it. The driver backed up, ran over the defendant's foot, and hit his knee with the bumper. The defendant grabbed his gun and opened fire on the car, although not aiming at anyone. He fired two shots with the nine millimeter gun, which he had bought on the street. He ran because he was scared, but he did not run very fast because his leg was hurting and continued to hurt. He ran to Mario's house, where he was spending the night, and gave the gun to Mario. Detective Woods testified that "Dante" is Mario Peoples' nickname.

Detective Woods testified that the defendant never asked to go to the hospital to have his leg or foot examined. He said the police took pictures of the defendant's shoes but not his foot. He said the defendant was wearing a red and black shirt, black Dickies, and red and black shoes. He said the defendant had a mustache, beard, and three gold teeth. He said he took the gun recovered from Mr. Peoples' house to the Georgia Bureau of Investigation (GBI) to find out whether the bullet found in the victim matched the gun.

Bernadette Davy, a firearms examiner for the GBI, testified that she received a Browning nine millimeter gun and a previously-fired nine millimeter bullet. She said her tests revealed that the bullet was fired from the Browning nine millimeter gun.

Sergeant Craig Johnson of the Chattanooga Police Department testified that he collected evidence from the crime scene on the night of the shooting. He stated that he found a wheel trim ring with a small portion broken out leaning against a protective pole by the pay telephone. He said he also collected evidence from the car driven by the victim. He said the left front wheel was missing the trim ring. He

said he found bright blue paint on the driver's side door, which was similar to that on the protective poles by the telephone at the crime scene. He stated that he found a bullet hole in the driver's side door below the mirror. He testified that a dowel placed in the hole indicated that the bullet traveled toward the back of the door. He said he found the bullet inside the door. He testified that he found a razor blade inside the victim's pocket. He said that he photographed the defendant's shoes and that as he was taking the photo, the defendant told him that someone had run over his foot. He said the defendant's shoes were fairly new with no debris or scuff marks on top of them.

Dr. Frank King, the Hamilton County Medical Examiner, testified that he performed an autopsy on the victim. He said the victim sustained a gunshot wound to the right front chest. He said the bullet passed at a downward angle through the aorta, heart, vena cava, and right middle lung. He said the bullet struck a rib and fell into the victim's chest cavity. He said the victim's wound indicated that the gun was two or more feet away from the victim when fired. He stated that the victim's toxicology report revealed that only lidocaine, a resuscitation drug, was present in the victim's body.

The defendant testified that on August 7, 1997, he intended to spend the night with Dante Peoples. He said that when he got to Mr. Peoples' house, no one was there. He said that as he was leaving, he noticed Mr. Peoples and some other people at the end of the block on the corner of Ridgeside and Gillespie. He said Quantana Penn and another girl, whom he did not know, joined them on the corner.

The defendant testified that a car pulled up past the pay telephone, the telephone rang, and he answered it. He said while he was on the telephone, the victim was talking with someone else. He said the victim drove the car in reverse at high speed and ran over his foot. He stated that the car could have pulled forward instead of backing up to leave. He said he quickly pulled out his gun and shot three times at the car because he was afraid the driver would run him down with the car. He said one never knows what is on the mind of a person who is talking to people who sell drugs. He said he carried the gun for protection because twice he had been in a car when someone shot at another occupant. He said he had the gun with him that day because he knew he would be out on the street. He stated that after he shot, he ran to Mr. Peoples' house because he was afraid that the driver would circle the block and return. He said he did not realize that he had hit anyone.

The defendant testified that when the police arrived that morning, he gave a statement because he did not feel like he had anything to hide. He admitted that he told Detective Woods that the victim had asked to use the telephone. He stated that he said that because his mind was clouded after he learned of the victim's death.

The defendant testified that when he went to the police service center four hours after the shooting, his foot was swollen. He said he asked the police to photograph his foot and to take him to the hospital. He said the detective told him that he could take him to jail for murder. He said that in the days following the shooting, his toe was swollen, oozing pus, bleeding, and changing color. He said that while in the holding cell on August 8 or 9, he showed his toe to the guards who gave him some ice and iodine. He said his foot was x-rayed five months later, but it was not broken. The defendant displayed his toe to the jury. He said that thirteen months later, his toe was still black and his toenail would not grow back.

Detective Tetzel Tillery testified on rebuttal that she was present when the defendant was questioned. She said the defendant did not request medical treatment, and the jail does not accept injured prisoners for booking. She said she was present

when the defendant was booked and saw no sign of bleeding or injury. She stated that if the defendant had injuries involving swelling, bleeding, and pus, then he would have been taken to the hospital.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support a conviction for second degree murder. He argues that the testimony at trial showed that he shot out of fear after the victim ran over his foot. He claims that the evidence falls short of showing that he acted knowingly as is required for second degree murder. The state contends that the evidence is sufficient.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). This means that we may not reweigh the evidence, but must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn.1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn.1978).

Second degree murder is the "knowing killing of another." Tenn.Code Ann. § 39–13–210(a)(1). Tenn.Code Ann. § 39–11–302(b) defines knowing as follows:

"Knowing" refers to a person who acts knowingly with respect to the conduct or circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Viewed in the light most favorable to the state, the evidence shows that the defendant approached the victim and tried to force open the victim's car door. The victim attempted to get away from the defendant by driving in reverse. When the victim was one to one and one-half car lengths away, the defendant fired three shots in the direction of the car. One bullet hit the victim in the chest. Shooting at a car from a distance of one to one and one-half car lengths is reasonably certain to result in the death of an occupant. "A person can act knowingly irrespective of his or her desire that the conduct or result will occur." *State v. Gray*, 960 S.W.2d 598, 604 (Tenn.Crim.App.1997); *State v. Rutherford*, 876 S.W.2d 118, 120 (Tenn.Crim. App.1993).

Furthermore, the jury could have reasonably concluded that the victim did not run over the defendant's foot. The defendant ran from the scene after the shooting. He did not seek medical treatment after the incident but, instead, went to a Krystal Restaurant that same morning. Sergeant Johnson testified that the defendant's shoes were fairly new and not scuffed on the morning of August 8, 1997. The photograph taken by Sergeant Johnson confirms this observation. The evidence is sufficient to support the defendant's conviction for second degree murder.

## II. SENTENCING

The defendant contends that his twenty-five-year sentence is excessive. He argues that the trial court erroneously enhanced his sentence with Tenn.Code Ann. § 40–35–114(10) because risk to human life is inherent in second degree murder. He claims that the trial court should have applied Tenn.Code Ann. § 40–35–113(3), (6), (11), and (13) in mitigation. The state contends that the sentence was proper.

Appellate review of sentencing is *de novo* on the record with a presumption that the trial court's determinations are correct. Tenn.Code Ann. §§ 40–35–

401(d), –402(d). As the Sentencing Commission Comments to these sections note, the burden is now on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. *State v. Fletcher,* 805 S.W.2d 785, 789 (Tenn.Crim. App.1991).

■■■ However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby,* 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40–35–210(f) (1990).

*State v. Jones,* 883 S.W.2d 597, 599 (Tenn. 1994).

■■ Also, in conducting a *de novo* review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf and (7) the potential for rehabilitation or treatment. Tenn.Code Ann. §§ 40–35–102, – 103, –210; *see Ashby,* 823 S.W.2d at 168; *State v. Moss,* 727 S.W.2d 229 (Tenn.1986).

■■ The sentence to be imposed by the trial court for second degree murder, a Class A felony, is presumptively the midpoint in the range when there are no enhancement or mitigating factors present. *See* Tenn.Code Ann. § 40–35–210(c). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and, then, reduce the sentence as appropriate for any mitigating factors. Tenn.Code Ann. § 40–35–210(d), (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. Tenn.Code Ann. § 40–35–210, Sentencing Commission Comments; *Moss,* 727 S.W.2d at 237; *see Ashby,* 823 S.W.2d at 169.

At trial, the defendant testified that in August 1997, he was twenty years old. He said he had graduated from high school and completed one semester at a community college studying diesel mechanics. He said he had worked in a restaurant, in construction, and at a foundry. He said that in August 1997, he worked with a temporary service. He said that he was sorry that the victim had died as a result of the shooting, that the victim's death was an accident, and that he shot at the car out of fear. At the sentencing hearing, the parties stipulated that while in high school, the defendant lettered in football and track and was active in his church. The defendant was active in the Boy Scouts, participated in summer baseball until age fourteen, and participated in the AAU Junior Olympics.

The presentence report reflects that the defendant received sixty days of diversion and two days of public service work for a weapons offense in 1996. At the time of the present offense, the defendant was on misdemeanor house arrest and electronic monitoring while awaiting the disposition of pending charges of possession of cocaine for resale and carrying a dangerous weap-

on. At the sentencing hearing, the defendant introduced a laboratory report regarding the analysis of the alleged cocaine for which the defendant was charged with possession for resale. The report states that no controlled substances were detected.

■■■ The trial court applied the following enhancement factors from Tenn.Code Ann. § 40–35–114:

(3) The offense involved more than one victim;

. . . .

(9) The defendant possessed or employed a firearm . . . during the commission of the offense; [and]

(10) The defendant had no hesitation about committing a crime when the risk to human life was high[.]

With regard to factor (3), the trial court found that the defendant was shooting at the female passenger in addition to the victim even though the defendant was not charged with any crimes in relation to the passenger. The defendant conceded that factor (9) applied. The court applied factor (10) because other people were in the area when the defendant opened fire on the victim. In mitigation, the trial court considered the defendant's involvement in high school sports and church activities under Tenn.Code Ann. § 40–35–113(13), but gave this factor little weight. The court imposed the maximum sentence of twenty-five years. The state subsequently dismissed the charges for possession of cocaine for resale and carrying a dangerous weapon.

■■■ The defendant contends that the trial court should not have applied enhancement factor (10) because a risk to human life is inherent in murder. *See* Tenn.Code Ann. § 40–35–114(10). The state contends that the trial court appropriately applied this factor because one or more of the bullets fired by the defendant could have hit the passenger. Although factor (10) is inherent in every homicide case relative to the victim, the trial court

may consider this factor when the defendant endangers the lives of people other than the victim. *See State v. Ruane,* 912 S.W.2d 766, 784 (Tenn.Crim.App.1995); *State v. Johnson,* 909 S.W.2d 461, 464 n. 1 (Tenn.Crim.App.1995); *see also State v. Butler,* 900 S.W.2d 305, 314 (Tenn.Crim. App.1994) (holding that factor (10) should not be applied when the victim is the only one at risk). In this case, the defendant fired three shots into a car containing two people. The passenger, Chasity McGuire, testified that she ducked when she saw the explosion from the gun. The defendant put Ms. McGuire's life at risk, and thus, factor (10) applies.

■■■ Although not raised by the defendant, the state would concede that enhancement factor (3), "the offense involved more than one victim," does not apply. Victim, "as used in Tenn.Code Ann. § 40–35–114(3), is limited in scope to a person or entity that is injured, killed, had property stolen, or had property destroyed by the perpetrator of the crime." *State v. Raines,* 882 S.W.2d 376, 384 (Tenn.Crim. App.1994). The defendant shot through the door and wheel trim ring of Ms. McGuire's car while committing the present crime. Under the *Raines* definition, Ms. McGuire is a victim because her property was damaged. Thus, the trial court properly applied this factor, although we acknowledge that it is not entitled to much weight.

■■■ The state also contends that the trial court should have applied enhancement factor (1) because the defendant has a prior history of criminal convictions or criminal behavior. *See* Tenn.Code Ann. § 40–35–114(1). The state argues that the defendant's 1996 conviction for a prohibited weapons charge supports the application of this factor even though the defendant received diversion for this conviction. The defendant contends that factor (1) does not apply when a defendant has received diversion for an offense and the offense has been dismissed.

The record does not reveal whether the 1996 conviction was expunged from the defendant's record at the end of the diversionary period.[1] Even if the conviction has been expunged, expunction "returns the person to the position 'occupied before such arrest or indictment or information'" not to "the position occupied prior to committing the offense." *State v. Schindler*, 986 S.W.2d 209, 211 (Tenn.1999) (quoting Tenn.Code Ann. § 40–35–313(b)). Our supreme court has held that the trial court may consider evidence of criminal acts resulting in diversion and eventual expunction as prior bad acts, which may form the basis for denying judicial diversion for the present crime. *Id.* It has also held that "the criminal acts underlying an expunged conviction may properly be considered to determine whether a defendant is a suitable candidate for alternative sentencing." *State v. Lane*, 3 S.W.3d 456, 462 (Tenn. 1999). Under this same reasoning, the criminal acts for which the defendant received diversion can be considered as prior criminal behavior under enhancement factor (1). Therefore, factor (1) would apply because the defendant possessed prohibited weapons in 1996.

■ The defendant contends that the trial court should have applied the following mitigating factors provided in Tenn. Code Ann. § 40–35–113:

(3) Substantial grounds exist tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense; [and]

(11) The defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct[.]

The defendant argues that the shooting was an impulsive reaction to the victim backing over his foot at a high rate of speed while he was talking on a pay telephone. The trial court considered these factors and rejected them, finding no reason to excuse or justify the defendant's behavior. While discussing whether the defendant's behavior was provoked under Tenn.Code Ann. § 40–35–113(2), the court found that the victim was fleeing from strangers who were attempting to force the car door open. The court found that although it was likely that the victim inadvertently ran over the defendant's toe while leaving, this was not sufficient to excuse the shooting. It further found that the circumstances surrounding the crime were not unusual.

The record supports the trial court's findings with regard to mitigating factors (3) and (11). The defendant testified that he had his gun because he planned to be out on the street. He said he knew that drug deals took place on the corner where the shooting took place. Chasity McGuire testified that the shooter and another tried to force the victim's door open. She said that the victim drove the car in reverse. The defendant admitted that he shot at the car. This evidence supports the conclusion that the defendant had contemplated the possibility of violence and instigated the situation that resulted in the victim's death. The trial court found such circumstances to be neither justified nor unusual and properly rejected mitigating factors (3) and (11).

■ The defendant also contends that the trial court should have applied mitigating factor (6), lack of substantial judgment due to his youth. Tenn.Code Ann. § 40–35–113(6). Factor (6) refers to a defendant's youth in the context of his or

---

1. The following exchange took place at the sentencing hearing:

 Court: There was a sixty day diversion with two days of public works?
 Defense Counsel: Which was completed.
 Court: August 15, 1996, was that dismissed and expunged from his record?

 Defense Counsel: Judge, it [was] completed so I assume it has been done. I didn't represent him in it but I assume that he has complied with it.

her "age, education, maturity, experience, mental capacity or development, and any other pertinent circumstance tending to demonstrate the defendant's ability or inability to appreciate the nature of his [or her] conduct." *State v. Adams,* 864 S.W.2d 31, 33 (Tenn.1993). The trial court found that the defendant was twenty years old at the time of the offense. In rejecting factor (6), the court observed that the defendant was hanging out on the corner with those he knew to be drug dealers while he was on house arrest and wearing an electronic monitoring device. The court characterized the defendant as streetwise. The record does not preponderate against the trial court's findings. In fact, the defendant testified that he had his gun with him that day because he knew he was going to be out on the street. This statement reflects a calculated judgment about the prospects for violence in the situation in which the defendant placed himself. The trial court properly declined to apply factor (6).

■■■ The defendant contends that the trial court erred in not mitigating his sentence under Tenn.Code Ann. § 40–35–113(13) due to his remorse for the crime. This court has held remorse to be a mitigating factor under the catchall provision in Tenn.Code Ann. § 40–35–113(13). *State v. Butler,* 900 S.W.2d 305, 314 (Tenn.Crim. App.1994). With regard to the defendant's remorse, the trial court found: "I listened very carefully to the defendant and watched him closely and I really didn't see any remorse at all. In fact, I found what appeared to be excuses for his behavior and quite frankly I didn't believe his story a bit." The trial court was able to observe the defendant's testimony and evaluate his demeanor and credibility. The record does not preponderate against the trial court's findings.

■■■ The defendant argues that the trial court should have considered his voluntary statement and full cooperation with the police from the moment that he learned that his bullet had struck the vic-

tim as mitigation under factor (13). *See* Tenn.Code Ann. § 40–35–113(13). The record does not indicate whether the trial court considered this contention. In any event, the evidence does not support a conclusion that the defendant cooperated with the police. The defendant went to Dante Peoples' house immediately after the shooting. Significantly, nothing in the record indicates that the defendant attempted to contact the police after the shooting despite the defendant's belief, according to Jasmine Patillo, that he might have hit the female passenger. In his statement, the defendant said: "I went and got something to eat at Krystal, you know, that's when I seen [sic] all the police coming. I was like dang. That's when I knew something had happened." Despite this realization, the defendant returned to Mr. Peoples' house, and Detective Woods discovered him in a back bedroom later that morning. The defendant contends that because he gave a statement to the police after he was taken into custody, he should be given credit for cooperating with the police. The defendant's course of conduct following the shooting does not suggest full cooperation with the police. This factor does not apply.

■■■ The defendant contends that the trial court should have applied Tenn. Code Ann. § 40–35–113(13) because of his work history. In *State v. McKnight,* this court noted that the "defendant would normally be due some favorable consideration based upon his family contributions and work ethic." 900 S.W.2d 36, 55 (Tenn. Crim.App.1994) (considering testimony that the defendant was a "hard worker" and provided financial assistance to his mother). On the other hand, this court has also held that a stable work history is expected of everyone and, therefore, is not a mitigator. *State v. Keel,* 882 S.W.2d 410, 423 (Tenn.Crim.App.1994). Acknowledging *Keel,* this court has affirmed the use of work history in mitigation when the defendant's "performance has surpassed that which is expected of him." *State v.*

*Randal A. Thies,* No. 02C01–9708–CC–00299, Tipton County, 1998 WL 391813, at \*7 (Tenn.Crim.App. Apr. 24, 1998) (noting the evidence revealed that the defendant was "prompt and did a 'real good job' "). In light of *State v. Gutierrez,* 5 S.W.3d 641 (Tenn.1999), though, we believe that *McKnight* represents the proper view of work history as a mitigator.

 We note that *Keel* also rejected the lack of a criminal history of prior felony convictions as a mitigating factor under Tenn.Crim.App. § 40–35–113(13), stating that the "vast majority of the citizens in this state do not have a prior felony conviction." 882 S.W.2d at 422. In *Gutierrez,* our supreme court held that the lack of a criminal history is an appropriate mitigator. 5 S.W.3d at 646. Similarly, we believe that consideration of a defendant's work history is consistent with the purposes and principles of the Sentencing Act. Generally, relative to sentencing, an individual's past essentially stands as a witness either for or against him or her. Specifically, a defendant's work history is relevant to his or her potential for rehabilitation, a factor to be considered in determining the length of the sentence. *See* Tenn.Code Ann. § 40–35–103(5).

However, the defendant's work history in the present case avails him nothing. At trial, the defendant testified: "I done worked restaurant, construction and foundry." He also testified that he had performed odd jobs through a temporary service. The record contains no other information regarding the defendant's work, such as job performance, length of service, or his reasons for leaving any of these jobs. We do not believe that the record contains sufficient evidence to justify using his work history in mitigation.

██ Finally, the defendant contends that the trial court failed to give him proper credit under Tenn.Code Ann. § 40–35–113(13) for his history of community activities while in high school. With regard to this factor, the trial court found:

I will take into consideration the stipulation that in prior years while the defendant was in high school, he was involved with [the] high school track team, football, he was in school, [and] that he participated in church activities. I will find that those things do apply, that those are mitigating factors that do apply. However, given all of the … enhancing factors …, I don't give … much weight at all to No. 13, which are these various activities he was involved with.

As long as the trial court complies with the purposes of sentencing and makes findings supported by the record, the weight to be given a mitigating factor lies within the trial court's discretion. *See* Tenn.Code Ann. § 40–35–210, Sentencing Commission Comments; *Moss,* 727 S.W.2d at 237; *Ashby,* 823 S.W.2d at 169. The trial court's application of this factor was proper.

The trial court properly enhanced the defendant's sentence with factors (3), (9), and (10) and applied but gave little weight to the defendant's participation in various activities while in high school under mitigating factor (13). We hold that enhancement factor (1) also applies. The defendant's twenty-five-year sentence is proper.

Based upon the foregoing and the record as a whole, we affirm the judgment of conviction.

WELLES and SMITH, JJ., concur.