IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 6, 2024

## STATE OF TENNESSEE v. EVANNY LITTLEJOHN

**Appeal from the Criminal Court for Shelby County**
**No. 21-03657        Carlyn L. Addison, Judge**

_____

### No. W2023-01690-CCA-R3-CD
_____

The Appellant was convicted of second degree murder and sentenced to twenty-five years' imprisonment. On appeal, she argues: (1) the evidence is insufficient to support her conviction because the State failed to establish she acted knowingly; and (2) the trial court erred by admitting evidence of three prior acts of domestic violence against the victim. After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TOM GREENHOLTZ, JJ., joined.

Claiborne H. Ferguson, Memphis, Tennessee, for the appellant, Evanny Littlejohn.

Jonathan Skrmetti, Attorney General and Reporter; Johnny Cerisano, Assistant Attorney General; Steve Mulroy, District Attorney General; and Regina Lucreziano and Sam Winnig, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

On September 21, 2021, the Appellant shot and killed her husband, Kantrell Littlejohn, at their house. The shooting stemmed from a heated argument between the Appellant and the victim's adult daughter, Princess Littlejohn. After the Appellant pointed a gun at Ms. Princess, the victim intervened and took the gun.[1] The victim attempted to leave to take Ms. Princess to a hotel but reentered the house to retrieve an item Ms. Princess

---

[1] Because Ms. Princess and the Appellant share the same last name, we will refer to Ms. Princess by her first name to avoid confusion.

forgot. A few seconds after he entered, the Appellant shot him. The Appellant was charged with first degree murder.

**404(b) Evidence**. Before trial, the State filed a 404(b) motion to permit evidence of the Appellant's prior bad acts. See Tenn. R. Evid. 404(b). Specifically, the State sought to introduce evidence of three prior acts of domestic violence against the victim: (1) a 2019 incident in which the victim reported that the Appellant had a gun and fired three shots into the air; (2) a 2015 incident in which the victim reported that the Appellant destroyed his property; and (3) a 2012 incident in which the victim reported that the Appellant assaulted him. The State contended that the incidents were admissible to establish that the killing was intentional, to show lack of mistake, and to provide context to the nature of the relationship between the Appellant and the victim. The trial court conducted a hearing, during which three police officers testified about the three incidents.

**I. April 21, 2019 Incident**. Memphis Police Department ("MPD") Officer Hollis Moore testified that on April 21, 2019, he and his partner responded to a call that the Appellant had "fired shots in the air at [the victim]." The report noted that they discovered a black and brown Springfield XP gun, which the Appellant stipulated was the same gun recovered at the murder scene. Officer Hollis testified that the Appellant was determined to be the primary aggressor and was taken into custody.[2]

The police report from the incident was admitted into evidence. The report included photographs of the gun and the scene. The report reflected that the victim advised he and the Appellant had gotten into a verbal argument. The Appellant then got into her car and, while in the street in front of the house, fired three shots into the air. She did not point the gun at him, but he was "in fear for [his] life." The officers located the gun in the trunk of the Appellant's car and three spent rounds in the street.

On cross-examination, Officer Hollis acknowledged that his partner was the primary officer, and he assisted. He did not speak to either party, search for the gun, determine whom to arrest, or write the report. He was not aware that the case had been dismissed.

**II. July 15, 2015 Incident**. MPD Officer Mathew Morton testified that on July 15, 2015, he and his partner responded to a "domestic incident" between the Appellant and the victim. The Appellant "had been drinking" and there was a physical altercation during which she ripped the victim's shirt and broke his laptop and desk.

---

[2] Because two officers in this case share the same last name, we will refer to each by their first name.

- 2 -

The police report from the incident was admitted into evidence. The report included a "Hold Harmless" form completed by the victim, in which he wrote the following statement:

> [The Appellant] was [lying] in the bed and got mad because I wouldn't take her shoes off. She got up and start[ed] cursing me. I told her I will be whatever you call me. She swung and missed. I caught her arm and let her go. She proceeded to destroy things in the bedroom. My laptop and computer desk were broken.

The report also included photographs of the damaged property and torn shirt. According to the report, the Appellant had slurred speech and no visible injuries. The Appellant admitted to breaking the laptop. When asked if she was injured, she advised that her upper arm hurt. No injuries were visible. Officers determined that the Appellant was the primary aggressor and took her into custody.

On cross-examination, Officer Morton acknowledged the report indicated that the victim stated the Appellant was highly intoxicated. He also acknowledged the Appellant was taken to the hospital at her request. He was not aware that the case had been dismissed.

**III. August 17, 2012 Incident.** MPD Officer Benjamin Moore testified that on August 17, 2012, he and his partner responded to a "hang call." A hang call occurs when a person calls 911 and does not speak to the dispatcher, but leaves the line open. He did not remember the incident firsthand but had reviewed his report. According to the report, they arrived and observed the Appellant and the victim arguing. The victim's shirt was ripped, and his face was injured.

The police report from the incident was admitted into evidence. The report included photographs of the victim's ripped shirt and a small laceration on his forehead. The report reflected that the victim advised that after a verbal argument, the Appellant attacked him when he refused to give her an extra set of car keys. The Appellant had no visible injuries. During the investigation, the Appellant "continually tried to provoke [the victim] and yelled over him [when] he spoke." Officers determined that the Appellant was the primary aggressor and took her into custody.

On cross-examination, Officer Benjamin said he did not know why the case was dismissed.

After hearing the above testimony and arguments from both parties, the trial court determined that evidence of the three incidents was admissible. First, the court said the evidence was probative of the Appellant's settled purpose to harm and intent to kill the

- 3 -

victim based on State v. Smith, 868 S.W.2d 561 (Tenn. 1993). The court described the incidents as "a pattern of conduct that's pretty consistent with [the Appellant] targeting [the victim] over the years." Second, the court determined that the evidence of the three incidents was clear and convincing. Though she had "some hesitation about the 2012 incident because of [Officer Benjamin's] inability to recall the facts," Officer Benjamin prepared the report based on his training and in the normal course of his job. Finally, the court stated, "I don't think that these [incidents] are prejudicial."

**Trial**. At trial, Princess Littlejohn testified that she was visiting her father, the victim, at his house on September 21, 2021. She was in the living room with the victim and the Appellant. She and the Appellant were drinking alcohol. Ms. Princess's daughter, the Appellant's mother (Venita Cole), and the Appellant's mother's boyfriend (Melvin Cole) were also there, but in different rooms.

At first, they were making music, rapping, and "having a good time." At some point, "things got heated" between the Appellant and Ms. Princess. Ms. Princess walked away, and the Appellant followed her and "kept talking [and] saying stuff to [her]." The Appellant tried to throw her phone at Ms. Princess. It was "getting out of hand," so Ms. Princess told the victim to come get the Appellant. The victim complied. The Appellant told the victim to get Ms. Princess out, so he told Ms. Princess to get her things ready to go to a hotel. Three to five minutes later, the Appellant "bust[ed] in" the room with a gun in her hand. She pointed the gun at Ms. Princess, and Ms. Princess feared for her life.

Ms. Princess said the victim grabbed the Appellant's hands and got the gun away from her. Ms. Princess finished grabbing her things and her daughter. She and the victim walked outside. As they passed through the living room, she tried to hand the Appellant some baby bottles because the Appellant told her that "if she bought something, she want[ed] it back." The Appellant said they could not drive her car, so Mr. Cole offered his. She and the victim got in Mr. Cole's car, which was parked in front of the house. The Appellant and Ms. Cole stood in the doorway and told the victim to come back inside. Ms. Princess told the victim she had forgotten something in the house and asked him to retrieve it. Ms. Princess watched from the passenger seat of the car as the victim walked toward the house. The Appellant was angry and "talking her smack to him." The Appellant, Ms. Cole, and the victim went inside.

A few seconds after the door shut, Ms. Princess heard gunshots and "just knew [the Appellant] shot [the victim]." Mr. Cole came outside and called the police. Ms. Princess called her mother and hid in the bushes until the police arrived. She did not have a weapon on her at any point that night, and neither did the victim.

- 4 -

On cross-examination, Ms. Princess confirmed she had been staying at the victim's house for one to two weeks before the shooting. She and the Appellant got along, and the Appellant had been helping her care for her daughter. She declined insulting the Appellant when she was rapping and reiterated that she did not know what made the Appellant so angry. She said the Appellant did not threaten her on her way outside, or when the Appellant was standing in the doorway. On redirect examination, she said she heard the Appellant tell the victim as he walked toward the house, "You [are] worrying about this b**** more than you [are] worrying about me."

Melvin Cole testified that he was married to Ms. Cole and considered the Appellant his stepdaughter. He had also known the victim for approximately twenty years. The night of the shooting, he was in the bedroom with Ms. Cole when the Appellant and Ms. Princess started arguing. He went into the living room to see what was going on. The Appellant told Ms. Princess she needed to leave because she was being disrespectful. The Appellant had a gun and was "acting erratic with it" but "never did point it." The victim took the gun from the Appellant. Mr. Cole gave the victim his car keys to drive Ms. Princess and returned to the bedroom. Ms. Cole told him to ride with the victim, so he began putting his shoes on. Before he finished, he heard two gunshots.

Mr. Cole left the bedroom and saw that "both [the Appellant and the victim] had the gun." He told Ms. Cole to get back and "got the gun out of their hand[s]." He called 911. The recording of the call was admitted into evidence and played for the jury. Mr. Cole can be heard reporting that the victim had been shot and was bleeding badly. The 911 dispatcher told him to get a towel and apply pressure to the wound. Mr. Cole initially avoided the 911 dispatcher's questions about the shooter, but eventually said it was the victim's wife. A woman can be heard crying in the background throughout the call.

Mr. Cole testified that after the police arrived, he went to the police station and provided a statement. After being told he could not leave until he viewed and signed a photographic lineup, he identified the Appellant as the person who fired the shots. On cross-examination, he said he had been living with the Appellant and the victim for one to two years. He had never seen them get into a physical altercation and agreed they were a "loving couple." They drank sometimes, and the Appellant was drinking tequila the night of the offense. He said when the Appellant and Ms. Princess were arguing, the victim was trying to calm them down. He said the person crying on the 911 call was the Appellant. She was on the ground with the victim, cradling his head.

MPD Officer LaKendus Cole testified that he investigated the crime scene in this case. Photographs of the scene, along with the gun recovered, a live round, and two .45 caliber shell casings were admitted into evidence. The photographs showed a shell casing

- 5 -

on the ground, a shell casing on the dining room table, a bullet defect in the living room ceiling, blood stains on the wall and floor, and a gun on the bed containing a live round.

MPD Officer Gregory Turner testified that he was the first officer to arrive on the scene. When he arrived, Ms. Princess was waving her arms and told him her father had been shot. The scene was chaotic. The victim was lying on the ground and bleeding from his chest. The Appellant was hunched over him, applying pressure to his wound. After other officers arrived, they realized the Appellant was the suspect and took her into custody. The Appellant said that "she accidentally shot."

On cross-examination, Officer Turner agreed that the Appellant was crying, cradling the victim's head, and trying to stop the bleeding. He acknowledged that he did not immediately recognize the Appellant as a potential suspect. Dispatch told him the victim's wife was the shooter, but no one in the house was answering when he asked who the victim's wife was.

Kasia Lynch, formerly a forensic scientist supervisor at the Tennessee Bureau of Investigation, testified that she received the gun, a live .45 caliber cartridge, and two fired .45 caliber cartridges. She confirmed that the cartridges recovered at the scene matched the cartridges that she test-fired from the gun. The gun was a Springfield Armory XD .45 caliber pistol in normal operating condition. The gun had three safeties—a trigger safety, a grip safety, and a firing pin safety. The trigger safety prevents the trigger from moving backwards without pressure. The grip safety prevents the trigger from being pulled until the person's hand is on the grip. The firing pin safety prevents the gun from firing until the trigger is pulled all the way to the rear. Ms. Lynch testified that it would require six pounds of pressure to pull the trigger, approximately the amount of pressure required to open a soda can.

On cross-examination, Ms. Lynch confirmed that these were passive, rather than active, safeties. Passive safeties are designed to prevent accidental discharge if the gun falls on the ground or knocks into something. Unlike an active safety, a passive safety does not have to be manually deactivated. The natural way of holding the gun will deactivate a passive safety.

MPD Lieutenant Byron Hardaway testified that he responded to the scene and spoke with the Appellant. The conversation was recorded on Officer Leon Bell's body camera and admitted into evidence. The recording shows the Appellant sitting in the back of a police car. Officer Bell asked her what happened, and she said she was not trying to shoot anyone. She said she got into an argument with Ms. Princess, and the victim was going to take Ms. Princess to a hotel room. She always kept her gun beside her because the neighborhood was not safe. She was trying to put it up, and they "got into a struggle" and

it "went off." Officer Bell walked away, and Ms. Princess can be seen screaming and crying. Officer Bell returned to the car the Appellant was sitting in. She asked if the victim was okay, and he said he did not know. Another officer approached, and she repeated her account. On cross-examination, Lieutenant Hardaway acknowledged he did not read the Appellant her Miranda rights before questioning her.[3]

Doctor Scott Collier, a forensic pathologist, testified that he performed the victim's autopsy and determined that the cause of death was a gunshot wound. Photographs showing a gunshot wound on the victim's upper chest near his right shoulder were admitted into evidence. The bullet injured the victim's right subclavian artery and was recovered in the victim's back. Its trajectory was downwards and to the left. The toxicology report indicated that the victim's blood did not contain alcohol or drugs.

MPD Officer Benjamin Moore testified that on August 17, 2012, he responded to a 911 call and heard a disturbance between the Appellant and the victim. The victim's forehead was injured, and his shirt was ripped. Photographs of his injury and ripped shirt were admitted into evidence. Officer Benjamin said the Appellant was combative and shouted over the victim. He arrested the Appellant for domestic assault. On cross-examination, he acknowledged he did not remember the incident and was relying on his written report. He agreed that people involved in domestic disputes may lie to avoid going to jail. When asked if he knew why the case was dismissed, he responded that he did not know the disposition.

MPD Officer Mathew Morton testified that on July 15, 2015, he responded to a domestic dispute between the Appellant and the victim. The Appellant was intoxicated and broke the victim's computer and desk and ripped the victim's shirt. Photographs of the broken computer, broken desk, and ripped shirt were admitted into evidence. The Appellant admitted to breaking the items and said that "she always goes to jail." Officer Morton arrested the Appellant. On cross-examination, he acknowledged that the victim was not injured, and that the Appellant was taken to the hospital after complaining of pain in her arm. He did not know why the case was dismissed.

MPD Officer Lain Fullilove testified that on April 21, 2019, he responded to a shots fired call involving the Appellant and the victim. The victim advised that he and the Appellant had a verbal argument, and she went outside to her car and "fired some shots in the air." The victim appeared nervous and scared. The Appellant said that her gun was in the trunk of her car and that she did not have anything to say. Officer Fullilove recovered the gun and three shell casings. He confirmed that the gun's serial number matched the

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

serial number of the gun used to kill the victim. On cross-examination, he stated he did not know why the case was dismissed.

MPD Sergeant Latanya West testified that she and another sergeant interviewed the Appellant the night of the offense. They advised her of her Miranda rights, and she waived those rights and agreed to answer questions. The interview was recorded via body worn camera, which was admitted into evidence and played for the jury.

The twenty-minute recording shows two officers questioning the Appellant. The Appellant said she had been drinking alcohol but could answer questions. She reviewed the Advice of Rights and agreed to speak with the officers. She said she was trying to see if the victim was okay. When asked what happened, she said they were having fun and listening to music until she and Ms. Princess "got into it." The argument got "so bad" that Ms. Princess packed her stuff and left. The Appellant said she always had a weapon on her because of the neighborhood they lived in. When she went through the hallway and turned the corner, she "made a mistake and shot [the victim]." She fell to the ground and said, "Call 911." When the police arrived, Ms. Princess yelled, "She killed my daddy."

When asked how she mistakenly shot, the Appellant said she did not have her finger pointed out like she should have. The officers asked if there was a struggle over the gun, and she said not until after the shot was fired. The victim tried to grab the gun because he did not know it was an accident. She said "to her knowledge" she only fired one shot. She denied ever displaying the weapon toward Ms. Princess. She said she and the victim agreed that Ms. Princess should leave. She told Ms. Princess that she could not ride in her car. She did not recall the victim going outside before the shooting or telling him to come back inside. At the end of the interview, the officers told the Appellant the victim died at the hospital, and she began to cry.

On cross-examination, Sergeant West acknowledged that the Appellant was not required to speak with her and could have invoked her right to an attorney or right to remain silent. She also acknowledged the Appellant was familiar with her Miranda rights because she had a bachelor's degree in criminal justice.

The State concluded its proof and Venita Cole, the Appellant's mother, testified for the defense. She said she was at the house but did not see the shooting. She "didn't hear much" of the argument between the Appellant and Ms. Princess because she was in her bedroom. After the shooting, she moved the gun to her bedroom. The Appellant had a habit of keeping her gun in the console of the couch while she was in the living room and moving it to her bedroom at night.

- 8 -

After hearing the above proof, the jury convicted the Appellant of the lesser included offense of second degree murder. The trial court conducted a sentencing hearing and sentenced the Appellant to twenty-five years' imprisonment. The Appellant filed a motion for new trial, which the trial court denied. As relevant to this appeal, the court determined that the three prior domestic incidents were admissible "to show a pattern and motive and intent." The Appellant now appeals.

## ANALYSIS

**I. Sufficiency of the Evidence.** The Appellant argues that the evidence is insufficient to support her conviction because the State failed to establish that she acted knowingly. She characterizes the offense as a "drunken struggle" and contends that the State presented no evidence that the shooting was not accidental. The State responds that the evidence is sufficient because it shows that the Appellant had a settled purpose to harm the victim, retrieved the gun, deactivated each of its three safeties, and fired two shots. We agree with the State.

When evaluating the sufficiency of the evidence, this court must determine "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Parker, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). Because a guilty verdict removes the presumption of innocence and imposes a presumption of guilt, the Appellant bears the burden of showing why the evidence is insufficient to support the verdict. Id. (citing State v. Rice, 184 S.W.3d 646, 661 (Tenn. 2006)). The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). The jury evaluates the credibility of witnesses, determines the weight given to their testimony, and reconciles all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). This court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

Second degree murder is "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id. at § 39-11-302. Because second degree murder is a result of conduct offense, the State must prove that the defendant knew that his or her actions were reasonably certain to cause the victim's death. State v. Brown, 311 S.W.3d 422, 431-32 (Tenn. 2010). This knowledge is sufficient "irrespective of his or her desire that the conduct or result will occur." Id. at 432 (quoting State v. Kelley, 34 S.W.3d 471, 478 (Tenn. Crim. App. 2000)). A defendant's

mental state is rarely subject to proof by direct evidence. Id. However, a jury "may infer a defendant's mental state from 'the character of the assault, the nature of the act and from all the circumstances of the case in evidence.'" State v. Davis, 466 S.W.3d 49, 69 (Tenn. 2015) (quoting State v. Inlow, 52 S.W.3d 101, 105 (Tenn. Crim. App. 2000)).

Viewed in the light most favorable to the State, the evidence is sufficient to support the Appellant's conviction. During a heated argument with Ms. Princess, the Appellant pointed a gun at her. The victim intervened and took the gun. At some point, however, the Appellant regained possession of the gun. When the victim tried to leave with Ms. Princess, the Appellant stood in the doorway and told him to come back inside. The victim went back inside the house to retrieve an item Ms. Princess had forgotten. As he approached the house, the Appellant told him, "You [are] worrying about this b**** more than you [are] worrying about me." They both went inside, and a few seconds later the Appellant fired twice, hitting and killing the victim.

Based on the nature and circumstances of the killing, a rational jury could have inferred the Appellant acted knowingly. Though the Appellant contended during the recorded body camera footage and the recorded interrogation that the shooting was an accident, the jury was permitted to discredit her contentions. See Campbell, 245 S.W.3d at 335. The Appellant's anger toward the victim the night of the offense and her history of violent acts against him during arguments suggest she instead acted knowingly or intentionally. See Tenn. Code Ann. § 39-11-301 ("When acting knowingly suffices to establish an element, that element is also established if a person acts intentionally."). Additionally, Ms. Lynch's testimony provides further proof that the shooting was not accidental. The gun contained three safeties designed to prevent accidental discharge. It would not have fired until the Appellant placed her hand on the grip and pulled the trigger backwards with approximately six pounds of pressure. The Appellant did so not once, but twice. Accordingly, the evidence is sufficient to support her conviction.

**II. 404(b) Evidence**. The Appellant argues that the trial court erred by permitting testimony about the three prior acts of domestic violence against the victim. She contends that the only purpose was to show her propensity to commit the charged offense. The State responds that the trial court acted within its discretion because the prior acts were highly probative of the Appellant's intent and settled purpose to harm the victim. Alternatively, the State argues that the Appellant has not shown that the evidence more probably than not impacted the verdict because the jury's determination that the killing was not premeditated reflects that it "did not find the 404(b) proof especially convincing." We conclude that the trial court acted within its discretion.

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid.

- 10 -

404(b). This rule recognizes that such evidence "carries with it the inherent risk of the jury convicting the defendant of a crime based upon his bad character or propensity to commit a crime," rather than convicting him based on the strength of the evidence. State v. Thacker, 164 S.W.3d 208, 239 (Tenn. 2005) (citing State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994)). This risk is "particularly strong when 'the conduct or acts are similar to the crimes on trial.'" State v. Clark, 452 S.W.3d 268, 289 (Tenn. 2014) (quoting Rickman, 876 S.W.2d at 828). Such evidence, however, may be admissible for "other purposes" such as establishing motive, intent, guilty knowledge, identity of the defendant, absence of mistake or accident, a common scheme or plan, contextual background, opportunity, or preparation. Tenn. R. Evid. 404(b); State v. Berry, 141 S.W.3d 549, 582 (Tenn. 2004).

The Tennessee Supreme Court "has previously held that prior instances of domestic abuse by a defendant against a victim can be admissible under Rule 404(b)." State v. Rimmer, 623 S.W.3d 235, 262 (Tenn. 2021) (affirming admissibility of evidence in first degree murder trial of defendant's prior rape and assault of the victim, with whom he had a previous romantic relationship); see, e.g., State v. Jarman, 604 S.W.3d 24, 51 (Tenn. 2020) (affirming admissibility of evidence in first degree murder trial of defendant's prior alleged assault of the victim, his girlfriend). Tennessee courts have reasoned that "violent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim." Jarman, 604 S.W.3d at 49 (quoting Smith, 868 S.W.2d at 574).

Before admitting evidence of other crimes, wrongs, or acts, the following requirements must be met:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). If the trial court substantially complies with these requirements, we will review its ruling for an abuse of discretion. Clark, 452 S.W.3d at 287 (citing State v.

- 11 -

DuBose, 953 S.W.2d 649, 652 (Tenn. 1997)). Without substantial compliance, however, the trial court will be afforded no deference. DuBose, 953 S.W.2d at 652.

The record shows that the trial court substantially complied with the 404(b) procedural requirements. The court conducted a hearing outside the jury's presence and determined that the evidence was relevant to the material issue of intent. Based on the police reports and officer testimony, the court concluded that the evidence of the three prior incidents was clear and convincing. Finally, the court determined that the evidence was not prejudicial. We will therefore review its ruling for an abuse of discretion.

The trial court did not abuse its discretion by admitting evidence of the three prior acts of domestic violence against the victim. The court described the acts as "a pattern of conduct that's pretty consistent with [the Appellant] targeting [the victim] over the years" and determined that they were relevant to establish intent. Because the Appellant was charged with first degree murder, the State was required to prove the Appellant acted intentionally. See Tenn. Code Ann. 39-13-202. Evidence of the prior acts was therefore relevant to the material issue of the Appellant's intent. See Rimmer, 623 S.W.3d at 262; Jarman, 604 S.W.3d at 51. Though this evidence was prejudicial, we cannot conclude that the court's determination that its probative value was not outweighed by the danger of unfair prejudice was an abuse of discretion. Accordingly, the Appellant is not entitled to relief.

## CONCLUSION

Based on the foregoing reasoning and authority, we affirm the trial court's judgment.

CAMILLE R. MCMULLEN, PRESIDING JUDGE