# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### December 12, 2001 Session

## STATE OF TENNESSEE v. CHARLES RANDALL ELROD

**Direct Appeal from the Criminal Court for Montgomery County**
**No. 40685     Robert W. Wedemeyer, Judge**

---

**No. M2001-01125-CCA-R3-CD - Filed January 31, 2002**

---

The defendant was convicted at a bench trial of three counts of aggravated assault and received an effective sentence of ten years. In this appeal, the defendant contends (1) the evidence was insufficient to sustain the convictions; (2) he was denied the right to testify; and (3) the sentence was excessive. After a thorough review of the record, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOE G. RILEY, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and JOHN EVERETT WILLIAMS, JJ., joined.

Roger E. Nell, District Public Defender; Charles S. Bloodworth, Assistant District Public Defender (at trial); and Robert T. Bateman, Clarksville, Tennessee (on appeal), for the appellant, Charles Randall Elrod.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Lance A. Baker, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

Hillman Eugene Smith testified he was awakened at approximately 1:30 a.m. on January 21, 1999, by a "big kick or boom" at the next-door apartment. Smith opened his door and saw the defendant, whom he recognized, and inquired what the defendant was doing. The defendant "mumbled obscenities" and lunged toward Smith. When the defendant's arm came inside Smith's door, Smith hit it with a small aluminum bat, causing the defendant to leave.

After waiting in his apartment for approximately 15 minutes, Smith left, taking his bat, to inform the landlord of the situation. While en route, Smith saw the defendant coming at him

wielding a large wooden bat. As Smith retreated to a neighbor's porch, the defendant struck Smith with the bat numerous times. Smith attempted to block the blows with his small aluminum bat, but the defendant knocked him down and wrestled the aluminum bat from Smith. Smith testified he neither threatened nor provoked the defendant, and he was in fear for his life. When Jim Bard and Steven Blair came out of their apartment, the defendant also struck them with the bat. The defendant then fled, and when the police arrived, they were unable to locate him.

After the officers left, Smith remained at Blair's apartment for approximately 20 minutes. Smith left, and while walking toward his apartment, he saw the defendant, who ran toward him with a bat yelling, "M----- F-----. Where's your bat at now?" The defendant then struck Smith approximately 15 times, knocking him down. Although Smith attempted to defend himself with a small pocketknife, the defendant ceased his attack only after Blair exited his apartment, armed with a four-foot measuring level. Smith suffered broken bones and was transported to the hospital.

Steven Blair testified that he heard a loud noise in Smith's apartment, which was above his. Blair opined the noise was of two persons fighting, who came down the steps onto his front porch. Blair opened his door and saw the defendant on top of the victim beating him with a bat. Blair pulled the defendant off the victim, and the defendant pushed him against the door. Blair further testified his next-door neighbor, Jim Bard, came outside and the defendant struck Bard in his head with the bat. The defendant then struck Blair three or four times with the bat, breaking his arm, before fleeing.

Blair further testified that Smith remained at his apartment for approximately 25 minutes after the police left. When Smith stepped outside, the defendant jumped on top of Smith, beating him with a bat and threatening to kill him. The defendant continued striking Smith until Blair obtained his four-foot level and went outside. The defendant, who had broken his bat while striking Smith, fled when he saw Blair coming with the level.

Jim Bard testified he heard a commotion, and when he exited his apartment, he saw Blair trying to get a bat from the defendant's hands while the defendant was striking Smith. Bard, who knew the defendant, instructed him to put down the bat and leave. The defendant then looked at him and inquired, "You want some too?" He then struck Bard in the head with the bat. Bard testified he was frightened. Bard was then taken to the hospital, and his injury required approximately ten stitches and that tubes be implanted in his head.

The defendant was convicted at the bench trial of aggravated assaults upon Smith, Blair and Bard.


## I. SUFFICIENCY OF THE EVIDENCE

The defendant asserts the evidence was insufficient to sustain his convictions. We disagree.

## A. Standard of Review

When an accused challenges the sufficiency of the evidence, this court must review the record to determine if the evidence adduced during the trial was sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence or a combination of direct and circumstantial evidence. State v. Brewer, 932 S.W.2d 1,18 (Tenn. Crim. App. 1996). This court is required to afford the state the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. State v. Tuttle, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995).

Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

## B. Analysis

The three-count indictment alleged the defendant intentionally or knowingly caused each of the three victims to "reasonably fear imminent bodily injury, by use of a deadly weapon." *See* Tenn. Code Ann. §§ 39-13-101(a)(2), -102(a)(1)(B).

The defendant contends the evidence was insufficient because Smith, Blair, and Bard were the aggressors, and he acted in self-defense. However, there was evidence that the defendant ambushed Smith, without provocation, striking him numerous times with a bat, and threatened to kill him. Furthermore, there was evidence that the defendant, without provocation, struck Blair and Bard with the bat, causing injury to both. Each victim testified he was frightened, thus establishing the element of reasonably fearing imminent bodily injury. *See* Tenn. Code Ann. § 39-13-101(a)(2). Furthermore, it is undisputed that a bat was used during each incident, which constituted a deadly weapon because the manner of its use made it capable of causing serious bodily injury or death. *See* Tenn. Code Ann. §§ 39-11-106(a)(5)(B), 39-13-102(a)(1)(B). The issue of self-defense is a question of fact to be resolved by the trier of fact. State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997). The evidence was sufficient to support the findings of guilt.

## II. RIGHT TO TESTIFY

The defendant contends he was deprived of his right to testify because the trial court neglected to comply with the Momon requirements, which are as follows:

> At any time before conclusion of the proof, defense counsel shall request a hearing, out of the presence of the jury, to inquire of the defendant whether the defendant has made a knowing, voluntary, and intelligent waiver of the right to testify. This hearing shall be placed on the record and shall be in the presence of the trial judge.

Defense counsel is not required to engage in any particular litany, but counsel must show at a minimum that the defendant knows and understands that:

(1) the defendant has the right not to testify, and if the defendant does not testify, then the jury (or court) may not draw any inferences from the defendant's failure to testify;

(2) the defendant has the right to testify and that if the defendant wishes to exercise that right, no one can prevent the defendant from testifying;

(3) the defendant has consulted with his or her counsel in making the decision whether or not to testify; that the defendant has been advised of the advantages and disadvantages of testifying; and that the defendant has voluntarily and personally waived the right to testify.

State v. Momon, 18 S.W.3d 152, 162 (Tenn. 1999). A Momon waiver in writing is also valid. *See id*. at 175. Although Momon involved a defendant not testifying at a jury trial, we conclude the Momon requirements also apply to bench trials.

The defendant did not testify at his bench trial. At the conclusion of the state's proof, defense counsel stated, "The defense rests." Counsel explained, "We looked it over, and everything we need has come from prosecution witnesses." The defendant was not personally examined on the record. However, the Momon opinion was filed after the trial of this case. The Momon issue was raised for the first time by new counsel in an amended motion for new trial.

The procedural guidelines set forth in Momon are not retroactive and apply only to "cases tried or retried after the date of this decision." *Id*. at 163. Accordingly, the Momon procedural requirements are inapplicable to the case at bar. Nevertheless, regardless of procedure, the right to testify is a "fundamental right. . . [which] may only be waived personally by the defendant." *Id*. at 161. Such a waiver may not be presumed from a silent record. *Id*. at 162.

At the hearing on the motion for new trial, the defendant testified that he expected and wanted to testify, but his counsel did not give him the opportunity to do so. The state presented no evidence to refute this testimony. Thus, we must conclude the defendant's right to testify was violated.

The denial of the right to testify can be harmless error, provided the state establishes harmlessness beyond a reasonable doubt. *Id*. at 167. In making this determination, courts should consider the following factors:

(1) the importance of the defendant's testimony to the defense case; (2) the cumulative nature of the testimony; (3) the presence or absence of evidence corroborating or contradicting the defendant on material points; [and] (4) the overall strength of the prosecution's case.

*Id*. at 168.

At the motion for new trial, the defendant testified as a proffer of what his trial testimony would have been. Essentially, he testified Smith was the aggressor; Blair and Bard were aiding Smith in the assault; and he was acting in self-defense with regard to his actions against them. The state conceded at the hearing that it had not established defendant's waiver of the right to testify; it argued the defendant's testimony would have made no difference in the guilty finding; and it contended an examination of the four harmless error factors set forth in Momon supported a finding of harmless error.

The trial court took the matter under advisement, indicating it would read the trial transcript and consider the defendant's testimony adduced at the hearing. The trial court subsequently entered an order denying the motion for new trial, noting it had considered the motion for new trial, amended motion for new trial, arguments of counsel, "testimony of witnesses," and the entire record.

We conclude the trial court's order was an implicit finding that the violation of the right to testify was harmless. Since the trial judge acted as fact-finder in the bench trial, his overruling of the motion for new trial was an implicit finding that the defendant's testimony would not have affected the outcome of the trial. The trial judge was in a much better position than this court to make this determination since he was able to judge the credibility of the witnesses. Thus, the evidence supports the determination that the violation was harmless beyond a reasonable doubt. This issue lacks merit.


### III. SENTENCING

The trial court sentenced the defendant to five years for each of the three aggravated assault convictions. The trial court further ordered two of the sentences to run consecutively, for an effective sentence of ten years. The defendant challenges both the length and consecutive nature of the sentences imposed. We conclude the defendant was properly sentenced.

### A. Standard of Review

This court's review of the sentence imposed by the trial court is *de novo* with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d). This presumption is conditioned upon an affirmative showing in the record that the trial judge considered the sentencing principles and all relevant facts and circumstances. State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999). If the trial court fails to comply with the statutory directives, there is no presumption of correctness and our review is *de novo*. State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997).

If no mitigating or enhancement factors for sentencing are present, Tenn. Code Ann. § 40-35-210(c) provides that the presumptive sentence for these offenses shall be the minimum sentence within the applicable range. State v. Lavender, 967 S.W.2d 803, 806 (Tenn. 1998); State v. Fletcher, 805 S.W.2d 785, 788 (Tenn. Crim. App. 1991). However, if such factors do exist, a trial court

should enhance the minimum sentence within the range for enhancement factors and then reduce the sentence within the range for the mitigating factors. Tenn. Code Ann. § 40-35-210(e); State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). No particular weight for each factor is prescribed by the statute, as the weight given to each factor is left to the discretion of the trial court as long as the trial court complies with the purposes and principles of the sentencing act and its findings are supported by the record. State v. Moss, 727 S.W.2d 229, 238 (Tenn. 1986); State v. Kelley, 34 S.W.3d 471, 479 (Tenn. Crim. App. 2000); *see* Tenn. Code Ann. § 40-35-210 Sentencing Commission Comments.

A court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:

. . . .

(2) [t]he defendant is an offender whose record of criminal activity is extensive; [or]

. . . .

(4) [t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high.

Tenn. Code Ann. § 40-35-115(b); *see also* State v. Black, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995). Furthermore, in the event the trial court finds defendant is a "dangerous offender," it must also determine whether the consecutive sentences are reasonably related to the severity of the offenses committed and serve to protect the public from further criminal conduct by the offender. State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995).

## B. Analysis

<u>Length of Each Sentence</u>

As a Range I standard offender, the defendant faced a range of punishment of three to six years for each aggravated assault. *See* Tenn. Code Ann. § 40-35-112(a)(3). The presentence report indicated the defendant had at least 13 prior misdemeanor convictions with at least two of these being committed while the defendant was on probation for another offense.

The trial court applied sentencing enhancement factors one (the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range), eight (the defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community), and ten (the defendant had no

hesitation about committing a crime when the risk to human life was high). Tenn. Code Ann. § 40-35-114(1), (8), (10). Enhancement factors one and eight were properly applied; factor ten was not. *See* State v. Hill, 885 S.W.2d 357, 363 (Tenn. Crim. App. 1994) (holding factor ten may not be applied to aggravated assault by use of a deadly weapon since high risk to human life is inherent in the offense). In mitigation, the trial court found that the defendant had a good family who was willing to help him.

Although the trial court erred in applying one enhancement factor, we conclude, based upon our *de novo* review, that the sentence of five years for each conviction is appropriate. *See* Lavender, 967 S.W.2d at 809 (holding misapplication of an enhancement factor does not necessarily require a reduction in the sentence).

Consecutive Sentencing

The trial court specifically found that the defendant had an extensive record of criminal activity and was a "dangerous offender," thereby allowing consecutive sentencing under Tenn. Code Ann. § 40-35-115(b)(2) and (4). The trial court further found that consecutive sentences were necessary to protect the public from further criminal misconduct by the defendant, and the effective ten-year sentence reasonably related to the severity of the offenses. *See* Wilkerson, 905 S.W.2d at 938.

The defendant's presentence report sufficiently establishes his extensive record of criminal activity, albeit for misdemeanors. This factor alone is sufficient to justify partial consecutive sentencing, regardless of whether the dangerous offender factor applies. State v. Adams, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997). Accordingly, we conclude the trial court did not err by ordering partial consecutive sentencing for an effective sentence of ten years.

The judgments of the trial court are AFFIRMED.

 

                                        _____
                                          JOE G. RILEY, JUDGE