# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT NASHVILLE
## August 13, 2024 Session

## STATE OF TENNESSEE v. DUSTIN WILLIAM RUSSELL

**Appeal from the Circuit Court for Williamson County**
**No. J-CR190246-B Deanna B. Johnson, Judge**

_____

### No. M2023-00891-CCA-R3-CD

_____

Defendant, Dustin William Russell, was convicted by a jury of second degree murder, reckless endangerment by discharging a firearm into an occupied habitation, and three counts of reckless endangerment with a deadly weapon. Defendant was sentenced to a total effective sentence of thirty years. On appeal, Defendant claims the trial court gave an improper instruction for second degree murder, the evidence was insufficient to support his second degree murder conviction, and the trial court abused its discretion in its application of an enhancement factor and in its failure to make findings to support partial consecutive sentencing on the dangerous offender factor. Following a thorough review of the record, the briefs, and oral arguments of the parties, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which J. ROSS DYER and KYLE A. HIXSON, JJ., joined.

Eric M. Larsen (at trial and on appeal) and John Webb (at trial), Franklin, Tennessee, for the appellant, Dustin William Russell.

Jonathan Skrmetti, Attorney General and Reporter; Brooke A. Huppenthal, Assistant Attorney General; Stacey Edmonson, District Attorney General; and Kelly A. Lawrence, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Facts and Procedural History

The Williamson County Grand Jury entered a true bill charging Defendant with first degree premeditated murder (count one), conspiracy to commit first degree murder (count

two), reckless endangerment – discharging a firearm into an occupied habitation (count four), and three counts of reckless endangerment with a deadly weapon (counts five, six, and seven). Defendant was charged with Lyndsey Grace Bronston on all six counts.[1] Co-defendant Bronston's case was severed from Defendant's.

This case arose from the shooting death of Clark Cable on his twenty-fifth birthday. Defendant was romantically involved with Co-defendant Bronston who was working as a prostitute. The victim was a client of Co-defendant Bronston. For unknown reasons, Co-defendant Bronston thought the victim was part of a conspiracy to kidnap her for sex trafficking, and she shared her concern with Defendant. Defendant drove with Co-defendant Bronston to the victim's home where he shot fifteen times into the home, striking and killing the victim. In Defendant's opening statement at trial, he admitted that he shot the victim but argued that he did so recklessly.

*Trial*

The victim's parents, Keri Anne Cable and Steve Cable, and his younger brother, were in their home with the victim when he was shot. Mr. and Mrs. Cable both testified at trial. In December 2018, the victim was living temporarily with his parents and younger brother in Brentwood ("the victim's house") in a two-story home with a basement. While the victim's younger sister was away at college, the victim stayed in her room which was a master bedroom with an adjoining bathroom on the right side of the top floor of the house closest to the street ("the victim's room"); the adjoining bathroom faced the front of the house. Mr. and Mrs. Cable's bedroom was directly below the victim's bedroom on the main floor.

On the evening of December 3, 2018, Mr. and Mrs. Cable, the victim, and the victim's brother attended a Predators hockey match to celebrate the victim's twenty-fifth birthday. Mrs. Cable testified that the victim was distracted during the match, constantly looking at his phone and sending text messages. At one point, the victim took a call. Mrs. Cable heard the victim tell the caller, "I can't hear you. What are you saying? I can't hear you. Wait 'til I get out of the game." The victim would not reveal to Mrs. Cable what was going on and stated simply that he would talk to the caller later.

After the game, during the twenty-minute drive to their home in Brentwood, the victim continued to receive text messages. He answered one call wherein he told the caller, a "girl," that he "d[i]dn't know what [she was] talking about," that he was with his family and that he would call her when he got home in "about ten minutes." As soon as they

---

[1] Co-defendant Bronston alone was charged in count three of tampering with the evidence.

arrived home, the victim went upstairs. Mrs. Cable assumed he did so to call the "girl" he spoke to earlier on the drive home. Mrs. Cable testified that everyone began preparing for bed as soon as they arrived home.

Mr. Cable testified that as he was walking through the house to make sure it was locked, he observed that the victim appeared to be "really upset." Mr. Cable recalled that at the hockey match, the victim "was having fun, but he seemed to be preoccupied." During the match, Mr. Cable was seated away from the victim and did not know about the text messages and calls the victim received, but on the drive home, Mr. Cable heard the victim whisper into his phone that he was with his family and that he would call back in about ten minutes when he got home.

When they returned home, Mr. Cable asked the victim if he wanted to talk about what was upsetting him. The victim declined to talk. Mr. Cable explained that this was "unusual" because he and the victim had spoken openly and freely with each other since the victim was a young child. Concerned, Mr. Cable suggested to Mrs. Cable that she talk to the victim.

Mrs. Cable talked to the victim, and the victim revealed that "this girl" he knew was accusing him of "set[ting] her up." When asked to explain further, the victim answered, "I don't know if she got attacked; if she got raped; . . . she thinks that it's my fault. She said something about a gang in Memphis and something about 7's [sic] . . . I don't even know what's going on. But she said she's coming after me." Mrs. Cable asked for more information and whether the police should be alerted. He declined, answering that it was "probably nothing." The victim ran a Google search of the "girl's" number and learned that it was assigned to Co-defendant Bronston. The victim found this "strange," because the "girl" had told him that her name was "Kelsey" or "Chelsea." The victim came across Co-defendant Bronston's Facebook page and told his mother, "If anybody's pulling something over on somebody, . . . I think it's her."

The victim told Mrs. Cable that he had met Co-defendant Bronston for dinner one time, and they had been "casual[ly] texting" each other. Mrs. Cable knew that the victim had been online dating and did not think Co-defendant Bronston was the first person the victim had met online. Although the victim had always been forthcoming and candid with his parents, he did not tell Mrs. Cable that Co-defendant Bronston was a prostitute.

The victim continued to receive text messages while he and Mrs. Cable spoke. The victim became alarmed when Co-defendant Bronston began texting information about his family. Co-Defendant Bronston texted that she knew the victim had a younger sister who lived in Chattanooga, and she identified Mrs. Cable by name as his mother. Co-defendant Bronston had never been to the victim's home nor met anyone in his family. The victim

suspected that Co-defendant Bronston learned about his sister and Mrs. Cable from viewing his Facebook page. According to Mr. Cable, the victim went to another room to make a call and when he returned, he stated that there was a "misunderstanding" and "not that big of a deal," and went upstairs to his room. Mr. and Mrs. Cable then proceeded to turn in for the night.

Mr. Cable testified that before going to bed, he saw headlights coming down the street. He looked out of his bedroom window and saw a vehicle parked in front of the house with the passenger door facing the house. Mr. Cable initially thought someone was lost and looking for directions because their house was in a "confusing area" and that happened on a "regular basis." Although there was no streetlight at the end of the street near his house, Mr. Cable testified that his next-door neighbors had lights turned on "quite often." Mr. Cable went downstairs and opened the front door. He could not identify who was in the car but could see a glow from inside the car suggesting that someone was looking at a phone. Mr. Cable shut the door and told Mrs. Cable that the victim's "friend" had arrived. Mr. Cable continued walking around the house turning off the lights. After he finished his walk-through of the house, Mr. Cable looked out of the den window and saw a flash coming from inside the vehicle. Mr. Cable yelled for everyone to "get down" and for someone to call 911.

Mr. Cable testified that after he saw the flash, he ran to his bedroom and that Mrs. Cable had taken cover behind her bed because there was a large window in front of their bedroom facing the street. Mr. Cable called out for his sons. The victim's brother responded, ran downstairs, and hid behind his parents' bed with Mrs. Cable. However, the victim did not respond. Mrs. Cable called 911 as Mr. Cable ran upstairs to check on the victim.

Mr. Cable scanned the victim's bedroom and saw the victim in the bathroom facing the window and looking out at the street. The victim "did a slow turn" toward Mr. Cable and began to fall. Mr. Cable ran over and caught him and laid him on the bathroom floor. The victim was still alive but began losing consciousness. Mrs. Cable was talking to the 911 dispatcher when she heard Mr. Cable yell out that the victim may have been hit. Mrs. Cable handed her phone to her younger son and went upstairs to check on the victim. She testified that blood was pouring out of the victim's body. She tried to stop the bleeding and kept begging the victim to "stay with [her.]" Mr. and Mrs. Cable remained with the victim until the police arrived. Two officers arrived before the EMT and they moved the victim to the bedroom so they could have more space to perform CPR. They stepped aside when the EMT arrived. All attempts to resuscitate the victim were unsuccessful. He died in his home.

An autopsy revealed that the victim died from a gunshot wound to the torso. A bullet struck the ribs, penetrating the aorta and injuring the pulmonary artery and the heart. Although the medical examiner who performed the autopsy could not testify to the position of the victim's body at the time he was shot, he was able to determine the trajectory of the bullet from using a scope. He testified that from an anatomic position – where a person is standing with the arms at the sides and feet shoulder width apart – the bullet traveled back to front, upward, and left to right. Due to the significant damage caused by the bullet, the medical examiner testified that there was "probably no hope" of the victim's surviving even with medical attention.

Crime scene investigators observed and retrieved two projectiles or fired rounds inside the house, two projectiles on and near the roof, and nine spent shell casings in the cul-de-sac, 49.41 yards from the house. Bullet entries or holes were observed in the victim's bathroom window, the exterior frame of the bathroom, the gutter above the bathroom window, Mr. and Mrs. Cable's bedroom, and the attic. Timothy Finney of Brentwood Police Department ("BPD")[2] was the first officer to respond to the scene and assisted in applying life-saving measures. He opined that a projectile had entered through the victim's bathroom window:

> [T]here's a window that had broken glass, on the face of the blinds were cracked or broken and then the mirror in the bathroom, which was right across from the window above the sink, was broken and there was some pieces of the broken glass [that] had fallen out into the sink area. And so it appeared the shot had come in through window – that way in the bathroom.

BPD Detective Guy Carden was among the officers who participated in the crime scene investigation of the victim's house on December 4, 2018. Detective Carden agreed with Officer Finney's assessment that a bullet had penetrated the victim's bathroom window. He concluded that this bullet most likely struck the victim and then shattered the bathroom mirror before falling on the bathroom floor where it was recovered. Detective Carden stated that the bullet hole in the window was consistent with a gun being fired from outside. After observing the victim's autopsy on December 5, 2018, Detective Carden learned about the trajectory of the bullet that killed the victim and opined that the fatal wound was consistent with the shooter firing the gun in an upward direction.

As for the remaining ballistics evidence, a second projectile was found lodged in a closet door in the victim's bedroom. According to Detective Carden, it was unclear

---

[2] At the time of trial, this witness was no longer working for the BPD, but was in Quantico, Virginia, training with the Drug Enforcement Administration. We will refer to him according to his employment at the time of the offenses to be consistent with the evidence and testimony at trial. Officer Finney testified remotely via Zoom as stipulated by the parties.

whether this projectile was the same round that penetrated the exterior bathroom frame or a separate round. Although there were bullet entries in Mr. and Mrs. Cable's bedroom directly below the victim's room, no projectiles were found there. There was also a pattern of markings on the front wall of the house consistent with a projectile striking the ground and continuing forward leaving a groove or rut in the soil. The projectile causing this pattern was not located.

Outside, Detective Carden retrieved two projectiles from the roof. One was lodged in the decking of the roof underneath the shingle. The second projectile penetrated the attic and exited through the back of the house. With his extensive experience and training in firearms, Detective Carden testified that a person must be able to shoot a target from twenty-five yards to qualify as an officer. He agreed that a handgun would not be "[his] first weapon of choice for a 50[-]yard shot." He added that a person's accuracy in shooting a handgun depended on the person's skills and ability. However, he conceded that it was possible to hit a target from 49.41 yards away with a handgun, and hitting the target would be easier if the shooter was given fifteen opportunities to hit the target. Detective Carden testified that he was unaware of Defendant's shooting skills and ability.

Andrew Breedlove, a twenty-year veteran detective with the BPD, and a Task Force Agent in the drug and human trafficking unit in the Tennessee Bureau of Investigation ("TBI"), responded to the shooting and set up the crime-scene van. Detective Breedlove collected information from the victim's cell phone and the internal memory was copied and converted to a readable format. Detective Breedlove explained that this process retrieves anything that may have been deleted and that a readable format of a phone's internal memory makes it easier to focus on things relevant to an investigation. Detective Breedlove examined the victim's phone manually after its internal memory had been extracted to look for information about the woman who had been texting the victim during the night. Detective Breedlove learned from Mr. and Mrs. Cable that the woman, known to the victim as "Kasey," also went by "Lyndsey Bronston" or "Lyndsey Bronsteen." There was no information about Co-defendant Bronston on the victim's phone other than her phone number which had a 931-area code. Detective Breedlove learned that the 931-area code number was a Google voice number which he described as "kind of [a] virtual phone number" not connected with a device but operating as a "real" number. Detective Breedlove contacted Google's law enforcement division and made a request for identifying information on the 931-area code number through an "exigent circumstances request." Co-defendant Bronston was identified as the account holder assigned to the 931-area code number under her name, Lyndsey Bronston, not "Kasey." The 931-area code number was tied to another device with a different number and an area code beginning with "4" ("4-area code") connected to an AT&T phone account. Detective Breedlove requested Co-defendant Bronston's AT&T phone's location which showed that the last time she used her

AT&T phone was at 12:41 a.m. on December 4, 2018, when it pinged off a tower located along I-24 in Coffee County.

Detective Breedlove ran Co-defendant Bronston's 931-area code number through a law enforcement database that runs searches on escort and prostitution advertisements and through Spotlight, a search engine run by Thorn, a nonprofit, anti-human trafficking organization. The first advertisement generated by Spotlight for the 931-area code number was still "active," meaning that it had been posted "just a few days" before the shooting. It included a photograph of the person who Detective Breedlove suspected was either "the suspect" or "one of the suspects" in the victim's murder. A search of Co-defendant Bronston's 4-area code number produced "old" advertisements posted several months before the shooting.

Detective Breedlove testified that the photographs in the advertisements tied to Co-defendant Bronston's numbers were consistent with her Facebook posts. She had two distinctive markings: a tattoo of a moth on her left breast and tattoos of bows on both of her thighs. Co-defendant Bronston's last "active" advertisement closest to the shooting was for Nashville only. The month prior, she had advertisements in Atlanta. The Nashville advertisement was from December 2, 2018, and alerted customers that she, "Kasey," was "in Nashville for the next few days trying to have fun." He testified that it is not uncommon for prostitutes not to use their real names or reveal their real ages. In this case, although Co-defendant Bronston advertised that she was twenty-one years of age, Detective Breedlove learned that she had just turned eighteen when the December 2, 2018 advertisement was posted.

Text messages indicated that the victim and Co-defendant Bronston first communicated on November 8, 2018. Based on his experience and training and what he gathered in the investigation of the case, Detective Breedlove presumed that the victim contacted Co-defendant Bronston in response to her advertisement and that the two met the following evening. Detective Breedlove agreed that prostitutes are often the targets of robbery and theft and that a young woman who is a prostitute would naturally be concerned about being the target of human trafficking. The victim and Co-defendant Bronston continued to communicate throughout the month of November and began texting each other every day starting November 23, 2018, Thanksgiving Day. The tone of the earlier text messages was friendly; they addressed each other as "honey" or "babe." Detective Breedlove explained that these kinds of words are commonly used by escorts with their customers. The text messages from Co-defendant Bronston took on a less friendly tone starting December 1, 2018, when Co-defendant Bronston texted the victim, "Are you going to come or not?" The victim replied that he could not because he was "busy at work." Three and a half hours later, the victim texted that he "just got robbed." Co-defendant Bronston sent two messages, "It feels like you're not being honest with me" and "I don't

see people that lie[.]" The victim texted back that he had "no reason to lie to [her]" and that he "just wanna see [her] like [he] did last time."

The next day, December 2, 2018, at 12:07 a.m., co-defendant Bronston asked whether the victim was "working with someone." Detective Breedlove testified that co-defendant Bronston sent the same message to two other people. The victim asked her what she meant and tried to assure her that he "just want[ed] to see [her] that's it." The following text exchange then occurred:

| | |
|---|---|
| Co-defendant Bronston: | No if you wanted to see me then you would have come instead of trying to keep up with my locations and then making excuses why you can't come. |
| The victim: | All I want to do is come see you at the time we agree on but every time we get close you go dark I just don't want what happened last time where I sit in my car for over an hour. |
| Co-defendant Bronston: | My bad these people were freaking me out last night. |
| The victim: | What happened[?] |
| Co-defendant Bronston: | I don't really know someone else staying there saw people circling my room. |
| The victim: | Are you okay?? |

Co-defendant Bronston did not reply to the last text but agreed to dine with the victim.

On December 3, 2018, the day of the shooting, the victim texted Co-defendant Bronston at 9:55 a.m., stating that he "want[ed] to see [her]." She did not respond until 6:13 p.m. and asked him where he was. He texted back that he was at the "PREDS game," the one he wanted to take her to. At 9:47 p.m., the texts from Co-defendant Bronston became more ominous and accusatory.

| | |
|---|---|
| Co-defendant Bronston: | You f***in tell me right now. |
| The victim: | Tell you what? |

| | |
|---|---|
| Co-defendant Bronston: | Who the f*** you sent to me and what they were planning. |
| The victim: | Honestly I'm sorry for whatever happened to you. idk (I don't know) what you are talking about. Wish I could help you out but I'm clueless. |

Co-defendant Bronston then mentioned the victim's mother, Mrs. Cable, for the first time: "That's ok we'll see if your mother knows anything. Keri Amos Cable right?" The victim indicated that Co-defendant Bronston had probably found his mother's name on his Facebook page, and then responded, "Literally I'm the one who tried taking you to dinner and a PREDS game." Co-defendant Bronston replied, "Way more than your Facebook I've done about every research clue I can find and I know all your information you stepped into a real serious territory." The victim texted her three minutes later that he "ha[d] no idea what you are talking about." Co-defendant Bronston replied: "That sucks you'd let something happen to them." The victim asked, "Can you please explain[?] I'm seriously clueless." Fifteen minutes later, the victim asked Co-defendant Bronston to answer her phone. Two minutes later, he texted: "What text messages? What phone calls?"

Thirty-three minutes later at 11:01 p.m., Co-defendant Bronston sent the victim a text asking him, "This your house[?]" followed by a second text with a photograph of a white male's hand holding a Smith & Wesson semi-automatic pistol with an extended magazine and a red back strap in front of the victim's house. Detective Breedlove testified that based on the position of the hand, the photograph was taken by someone other than the person holding the gun. The man holding the gun was later identified as Defendant. In the photograph, he was wearing a black Realtree camouflage jacket. The photograph was taken inside a vehicle, and one could see a flash from the camera on the photograph suggesting that it was dark outside the car when the photograph was taken. Detective Breedlove testified that a photograph of a Smith & Wesson semi-automatic MMP gun with a red back strap and three magazines including an extended magazine was posted on Co-defendant Bronston's Instagram account and saved on her iCloud account on November 9, 2018. He added that not many prostitutes carry guns, but some do. He explained that it is more often the pimp who is armed.

In terms of the vehicle, Detective Breedlove recognized the inside of the vehicle as a Trailblazer because he drove one for five to six years while working undercover and his wife drove one as well. The photograph also showed a distinctive burn mark on the arm rest of the front passenger door.

Although nine shell casings were found at the scene, Detective Breedlove calculated that there were probably more than nine shots fired. Detective Breedlove explained that the pistol in the photograph had an extended magazine which meant that there were fourteen rounds in the magazine plus one round in the chamber. His calculation was later confirmed by footage captured by a neighbor's outdoor security camera. The camera did not capture any video of the shooting but contained an audible sound of the shooting and Detective Breedlove said he could "distinctly hear 15 shots . . . being fired in a very rapid pace" in the span of three and a half seconds. The time stamp on the video was 11:02 p.m. immediately after Co-defendant Bronston texted the victim the image of the gun. Detective Breedlove testified that records showed the victim was on the phone with someone else at the time of the shooting and, thus, may not have seen the text messages from Co-defendant Bronston.

Because Co-Defendant Bronston had not turned off her phone settings, Detective Breedlove was able to track and locate her Google searches on the day of the shooting. Co-defendant Bronston's Google search history for December 3, 2018, showed that she searched for "Brentwood Police Department," visited the department website at BrentwoodTn.gov, and the police department's Facebook page. She also ran a search on Josh Wickwire, a BPD officer who was "prominently displayed" on BPD's social media pages, Mr. and Mrs. Cable, the victim's phone number, and viewed mugshots of several people in Memphis and read press clippings about the "Murda Squad" out of Memphis. Detective Breedlove testified that he found no connection among the victim, the BPD, and the "Murda Squad." Co-defendant Bronston's search history also showed a search for "Joe Jones," the person who was purportedly circling around the hotel where she stayed. Detective Breedlove followed the links Co-defendant Bronston found in her search for "Joe Jones." None of the links mentioned the victim or the BPD. Detective Breedlove testified that there was a "Joe Jones" from Memphis but whether "Joe Jones" was acting suspiciously around the hotel as reported by Co-defendant Bronston was "speculati[ve]." At 12:23 a.m., after the victim was shot, Co-defendant Bronston searched for "delete apps." Detective Breedlove found no evidence that the BPD was involved in any alleged scheme of kidnapping as believed by Co-defendant Bronston.

Detective Breedlove had no leads on any suspect other than Co-defendant Bronston. He tracked down Co-defendant Bronston's address to a trailer park on Rock Creek Road in Tullahoma. He did not find her there but interviewed her mother. It was there that he first heard about Defendant. He learned that Co-defendant Bronston and Defendant had been dating for several months and were "very much aligned." Defendant's name came up again when he spoke with Co-defendant Bronston's sister. She told Detective Breedlove that the Trailblazer was her car but that Co-defendant Bronston was using it with Defendant and that the two of them were "always together." She believed that they

may have "skipped" town. Detective Breedlove also received a report from another law enforcement agency putting them together.

Defendant was traced to a residence in Tullahoma ("Defendant's residence"). Co-defendant Bronston had reportedly been involved in a domestic abuse matter with a person other than Defendant at the same address. Although there was no arrest, the police report of the domestic dispute put her presence there. Detective Breedlove interviewed several neighbors in the area who had observed a vehicle fitting the description of the Trailblazer. Armed with a warrant for Co-defendant Bronston's arrest, Detective Breedlove entered Defendant's residence along with officers of the Tullahoma Police Department. While conducting a sweep of the residence to locate Co-defendant Bronston, Detective Breedlove saw items of interest to the investigation, so he and his team stepped out of the residence without touching or retrieving anything and returned with a warrant to search the premises. Detective Breedlove collected a spent shell casing on a foam mattress on the floor and another spent .45 caliber shell casing on the floor near the foam mattress. Both shell casings along with two cartridge cases were submitted to the TBI where a microanalysis examination demonstrated that they were fired from the same unknown .45 caliber automatic firearm.

The Trailblazer was found at Defendant's grandmother's house in Winchester where Defendant and Co-defendant Bronston had stayed for a few days before leaving behind the Trailblazer and its keys. However, Defendant's grandmother's green Nissan Sentra was missing. The Trailblazer was searched on December 7, 2018, pursuant to a warrant. Detective Breedlove "absolutely believed" the Trailblazer was the vehicle seen outside the victim's home at the time of the shooting because of a "unique" burn mark located between the door lock mechanism and the window button on the passenger side consistent with the photograph sent to the victim.

During the search of the Trailblazer, Detective Breedlove collected a rental application for Co-defendant Bronston and Defendant, photocopies of their driver's licenses, a Georgia temporary registration plate, an unfired .45 caliber bullet, and a Wal-Mart receipt dated December 3, 2018, at 12:16 p.m. The receipt placed Defendant and Co-defendant Bronston at the Wal-Mart in Hermitage in Davidson County. In the video surveillance footage obtained from the store, Defendant and Co-defendant Bronston were seen walking together in the store less than twelve hours before the shooting. Detective Breedlove put out a "be on the lookout" or BOLO for Defendant and Co-defendant Bronston using a still photograph of them from the surveillance footage. He did not recall anyone reporting their whereabouts from the BOLO. Detective Breedlove obtained additional surveillance footage placing Defendant and Co-defendant Bronston at the Lotus Inn which had a reputation as a place of "hard core prostitution activity" and "non[] stop"

illegal drug activity. The footage from the Lotus Inn showed the Trailblazer in the parking lot.

In addition to searching the Trailblazer, Detective Breedlove swabbed it for gunshot residue. A camouflage jacket and a black pullover were collected after Defendant and Co-Defendant Bronston were apprehended and were also swabbed for gunshot residue. A microanalysis was performed on the gunshot residue tests from the Trailblazer, jacket, and pullover and showed that particles bearing "the appropriate appearance and composition" of gunshot primer residue were found in the Trailblazer and on the right sleeve and front left part of the pullover. No particles were found on the jacket. Defendant's phone was collected but it was a flip phone which could make and answer calls, send and receive text messages, but could not access the internet. According to Detective Breedlove, there was no indication Defendant communicated with the victim or that they knew each other.

On December 5, 2018, Detective Breedlove and his captain located Defendant's mother, Johanna Gifford, and interviewed her at her place of employment. Ms. Gifford lived in Winchester while Defendant lived in Tullahoma, some fifteen miles away. At trial, Ms. Gifford testified that before the shooting, her son had stopped coming to family functions and she had not spoken with him for several months. Sometime after December 3, 2018, Defendant called her at work and asked her to come to his uncle's home in Tullahoma. Ms. Gifford met Defendant at the house after work. Although Defendant sounded "pretty calm" over the phone, she suspected something was wrong as soon as she saw him.

Ms. Gifford had not met Co-defendant Bronston until that day. Defendant told Ms. Gifford that he killed a man, and he pulled up a news report of the shooting on his phone for her to read. She did not recall the news report stating that the shooting was gang related or related to sex trafficking. He admitted that he had pulled the trigger that killed the victim. She testified that Defendant displayed no remorse regarding the shooting. Defendant told her that Co-defendant Bronston "was going to get sex trafficked" by some gangs. Ms. Gifford recalled being in "disbelief." Co-defendant Bronston told Ms. Gifford that she was sorry for getting Defendant involved. When Ms. Gifford asked Defendant why he did not go to the police, Defendant replied that the police were involved in the sex trafficking scheme.

Defendant no longer had the murder weapon when he came to his uncle's house. While Ms. Gifford had never known Defendant to own a gun, she was not surprised that he had a gun because she was somewhat "suspicious" of the people he had been associating with. She was unaware of Defendant's involvement with a gang or with prostitution until the circumstances of his relationship with Co-defendant Bronston came to light. She added that he was "never in trouble" as a child or considered a bully.

Ms. Gifford neither contacted police nor encouraged Defendant to turn himself in to the authorities. She made no attempts to investigate Defendant's story because Defendant "truly believed it himself and it made [her] believe it." Defendant also talked about fleeing, and she advised him to go to his paternal grandmother's house with whom he shared a close bond. Ms. Gifford explained that she hoped that she, Defendant's father, and the grandmother could join forces to convince Defendant to turn himself in. Defendant went to his grandmother's house but stayed there only a day before driving off in his grandmother's car. Ms. Gifford called Defendant and told him that his actions were affecting the family. That was the last conversation she had with Defendant until he was captured.

Homicide Detective Eric Carpenter of the City of Phoenix, Arizona Police Department testified that on December 13, 2018, he was called in to interview Defendant after Defendant had been pulled over during a traffic stop in Phoenix. Detective Carpenter was aware that Defendant and Co-defendant Bronston were wanted in Tennessee. Detective Carpenter was given a general overview of the investigation by the BPD as well as a copy of the photograph of the person holding a gun in front of a house and audio from a residential security camera.

Detective Carpenter testified that he interviewed Defendant and Co-defendant Bronston separately. After Defendant was advised of his *Miranda* rights,[3] he agreed to talk to Detective Carpenter. His interviews were recorded, and portions of the recordings were played during Detective Carpenter's testimony. Defendant stated that he believed he was being interviewed because he took his grandmother's car. He then told Detective Carpenter that he and his "girlfriend," Co-defendant Bronston, fled Tennessee because Co-defendant Bronston was charged with drug-related charges although there were no outstanding warrants. Defendant added "several story lines" which Detective Carpenter admitted he was "struggling to separate[.]" Defendant told Detective Carpenter he did not like Co-defendant Bronston's "occupation choice." According to Defendant, Co-defendant Bronston "was in it bad," and he could not stop her from prostituting. He said he had become her "protector" because she had a "rough life."

Defendant also told Detective Carpenter that a man named "Joe Jones" was trying to kidnap Co-defendant Bronston for human trafficking. Defendant said he had seen "Joe Jones" in the parking lot of a hotel where Co-Defendant Bronston was working while Defendant was looking out for her. Detective Carpenter testified that he tried to investigate "Joe Jones" and the alleged human trafficking story, but it did not lead to anything.

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) (holding any statement made by the accused during a custodial interrogation without the benefit of procedural safeguards is inadmissible in court).

Defendant acknowledged that there was a shooting but denied shooting the victim. At first, Defendant accused Co-defendant Bronston of taking his car and shooting the victim by herself. However, when confronted with the image of him holding the gun, Defendant admitted he was there when the victim was shot but stated that he stepped out of the car and returned only after Co-defendant Bronston had fired the gun. Defendant stated that after the shooting, he and Co-defendant Bronston decided to make their way west. Detective Carpenter testified that Defendant denied killing the victim, but also stated that he "did not mean to hurt anybody and he was just trying to protect [Co-defendant Bronston]."

Detective Carpenter confirmed that during the interview, Defendant asked about Co-defendant Bronston's well-being and asked to see her. Detective Carpenter permitted Defendant and Co-defendant Bronston to see each other three separate times following their individual interviews. Their meetings in the interview room were recorded and played at trial. Detective Carpenter agreed that the two became "emotion[al]" when they were reunited in the interview room. Co-defendant Bronston told Detective Carpenter that she was "sorry" that she got Defendant involved and that it was her "fault." She told Defendant the same when they were alone together. While they were together for the last time, Detective Carpenter entered the interview room and showed Defendant a photograph of the victim and asked whether "the face looked familiar." Detective Carpenter agreed that while "the recording in [the] room was not the best" and it was difficult to make out what Defendant said, it sounded like his response was, "Who is that?"

Detective Carpenter assisted in the search of Defendant's grandmother's car in Arizona. A 40 Remington .45 auto 230 grain full metal jacket ammunition box was found in the vehicle. Detective Carpenter testified that the bullets in the box were not all Remington. Some of them were Tula, one was KPG, and another one was RMP. Despite the differences in the brand names, the bullets were all stamped .45 caliber. Detective Carpenter recalled that the car was "[p]acked from floor to almost the top line of the seats" with clothing and personal items, including the jacket and pullover that were collected and tested for gunshot residue.

Defendant did not testify and presented no witnesses.

*Jury Instructions*

The jury was given the following instructions for the lesser-included offense of second degree murder in count one of the indictment:

COUNT 1 – LESSER[-]INCLUDED OFFENSE 1: SECOND DEGREE MURDER
(Knowing Killing of Another)

Any person who commits second degree murder is guilty of a crime.

For you to find [Defendant] guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) that [Defendant] unlawfully killed Clark R. Cable;

and

(2) that [Defendant] acted knowingly.

A defendant's conscious objective need not be to kill a specific victim. If you find beyond a reasonable doubt that [D]efendant intended to cause the result, the death of a person, then the killing of another, even if not the intended victim, would be second degree murder.

After instructing the jury on the remaining lesser-included offenses of count one and the elements of the offenses charged in counts four to seven, the trial court defined "knowingly" in a separate section on definitions:

"Knowingly" means that a person acts knowingly with respect to the conduct or circumstances surrounding the conduct when the person is aware of the nature of the conduct or that circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

The requirement of knowingly is also established if it is shown that the defendant acted intentionally.

Intentionally means that a person acts intentionally when it is the person's conscious objective or desire to cause the death of the alleged victim.

*Closing Argument*

The State argued that Defendant's act of firing the gun fifteen times into the victim's home was intentional. The defense conceded that Defendant fired the gun, thereby causing the victim's death, but argued that the proof evinced a reckless homicide and "nothing more than that." The defense briefly discussed the elements of second degree murder and referred the jury to the "definitions section" of the jury charge and specifically referred to the "[l]ast sentence of the definition of knowingly." Defense counsel read from the jury charge and argued that the facts did not support a knowing killing as the term was defined in the instructions given by the trial court:

- 15 -

[S]econd degree is a knowing kill. It says: A person act[s] knowingly with respect to a result for the person's conduct when the person is aware that the conduct is reasonably certain to cause a result, reasonably certain in other words.

Given all that we've talked about and all you've seen in this case, does this leave you reasonably certain that the results can be caused by, by the shots right here from the (sic) fifty yards, all brick house? The State has got to prove that beyond - - beyond a reasonable doubt and I'm certain they have not.

The defense contrasted the elements of second degree murder with the elements of reckless homicide:

Recklessly means that a person[] act, acts recklessly when a person is aware of, but consciously disregards a substantial and unjustified risk that the alleged victim will be killed. The risk must be of such a nature and degree that its disregard constitutes gross deviation from the standard of care an ordinary person would exercise under the circumstances.

Aware of but disregards a justifiable risk that the alleged victim will be killed. If you look at that and compare that with reasonably certain, I would assert to you that the facts fit reckless homicide.

Based on the proof, the jury convicted Defendant of the lesser-included offense of second degree murder in count one, found him guilty of reckless endangerment via discharge of a firearm into an occupied habitation as charged in count four, and reckless endangerment with a deadly weapon, as charged in counts five, six, and seven. The jury found Defendant not guilty of conspiracy to commit first degree murder in count two.

*Sentencing*

Defendant's presentence report and eleven letters from friends and family members of the victim were admitted without objection. The program from the victim's memorial which included several photographs of the victim throughout his life was also made an exhibit. The victim's mother, Mrs. Cable, read from a prepared statement describing how the victim's death had devastated her and her family. She described the victim as "a sweet, loving, kind man whose only crime was looking for love in the wrong place." Mrs. Cable also read Mr. Cable's statement which concluded by describing his last encounter with Defendant:

[T]he last time you walked past me in the Courtroom, the little smirk on your face showing your lack of remorse for what you . . . have done and the carelessness for life and the irresponsibility of your actions that you took; I will never forget. I'll never forget.

Mrs. Cable asked the trial court for "the maximum sentence[s] allowable by Tennessee law" and for the reckless endangerment convictions to run consecutively to the second degree murder conviction.

Defendant introduced nine letters from friends and family members which were admitted as a collective exhibit. Defendant's father, Joe Oliver Russell, testified that several family members were in the courtroom to show their support. He acknowledged that Defendant needed to be punished for what he had done. Mr. Russell concluded his testimony by saying that Defendant would "change it all if he could." Mr. Russell placed the blame on Co-defendant Bronston stating that "all our lives are now changed" because Defendant and the victim met her.

In an allocution statement, Defendant apologized to the victims stating that he was "not in [his] right state of mind," and "never intended to hurt anybody." He stated further that he was prepared to "accept full responsibility for [his] actions."

In determining Defendant's sentence, the trial court applied one enhancement factor and no mitigating factors. Specifically, the trial court rejected the State's position that enhancement factor three – the offense involved more than one victim – applied to the second degree murder conviction but agreed that Defendant had no hesitation about committing a crime when the risk to human life was high. *See* T.C.A. § 40-35-114(3), (10). Although the trial court found the circumstances of the case to be "unusual," the trial court did not find that the offenses were committed under unusual circumstances such that a sustained intent to violate the law was unlikely or that Defendant acted under the duress or domination of another person. *Id.* § 40-35-113(11), (12). For count one, the trial court sentenced Defendant to twenty-five years to be served 100% by operation of law. *Id.* §§ 40-35-501(i)(1), (i)(2)(B). Defendant was sentenced as a Range I offender to five years for reckless endangerment by discharging a firearm into an occupied habitation (count four). The trial court imposed a two-year sentence for each of the three reckless endangerment with a deadly weapon convictions (counts five, six, and seven), and merged them into count five.

The trial court then found Defendant to be a dangerous offender whose behavior indicated little or no regard for human life and who had no hesitation about committing a crime in which the risk to human life was high as contemplated in Tennessee Code Annotated section 40-35-115(4), and ordered counts four and five to be served concurrently

- 17 -

with each other but consecutively to the second degree murder conviction for a total effective sentence of thirty years.

*Motion for New Trial*

Defendant filed a premature but timely motion for new trial. In his amended motion for new trial, Defendant argued that the trial court erred in its instructions to the jury on the definition of "knowingly" as it related to his second degree murder conviction. At the hearing on the motion for new trial, Defendant acknowledged that he did not object to the instructions contemporaneously but argued that waiver did not apply in a claim of an erroneous instruction of a charged offense. Defendant argued that the jury was only to be instructed on the last portion of the definition of "knowingly" - that it is a result of conduct offense – but that in this case, the entire definition of knowingly was given to the jury. Relying on *State v. Page*, 81 S.W.3d 781 (Tenn. Crim. App. 2002), Defendant argued that second degree murder is "strictly a result of conduct offense" and the jury should have been instructed accordingly. The trial court denied the motion for new trial on May 31, 2023. This timely appeal followed.

**Analysis**

I. <u>Jury Instruction</u>

Defendant claims the trial court improperly instructed the jury on the definition of "knowingly" as applied to second degree murder. While not conceding error, the State responds that any instructional error was harmless because the trial court's definition of "knowingly" did not lessen the State's burden of proof.

Although not addressed by the parties in their briefs, in order to determine the standard of review, we must first consider whether this issue is waived. As reflected in the record and as Defendant conceded at the motion for new trial hearing, Defendant did not object contemporaneously to the jury instruction but raised the issue for the first time in the motion for new trial. "An erroneous or inaccurate jury charge, as opposed to an incomplete jury charge, may be raised for the first time in a motion for a new trial and is not waived by the failure to make a contemporaneous objection." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005); Tenn. R. Crim. P. 30(b) ("Counsel's failure to object does not prejudice the right of a party to assign the basis of the objection as error in a motion for a new trial."); *cf. State v. Jones*, 589 S.W.3d 747, 762 (Tenn. 2019) (reiterating that an omitted or incomplete instructional issue is waived and can be reviewed for plain error only where the defense failed to object contemporaneously). Because Defendant complains that the trial court's instruction was erroneous as opposed to incomplete, and he raised that issue in the motion for new trial, his failure to object contemporaneously does

not result in waiver of the issue. *Cf. Faulkner*, 154 S.W.3d at 58 (reviewing the instructional error issue for plain error where the defendant failed to object contemporaneously and failed to raise it in his three motions for new trial).

Turning to the standard of review, appellate courts consider the sufficiency of jury instructions as a mixed question of law and fact reviewed de novo with no presumption of correctness. *State v. Benson*, 600 S.W.3d 896, 902 (Tenn. 2020); *State v. Cole-Pugh*, 588 S.W.3d 254, 259-60 (Tenn. 2019). Defendants in criminal cases have a constitutional right "to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury upon proper instructions." *Faulkner*, 154 S.W.3d at 58 (quoting *State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001)); *see also* TENN. CONST. art. I, § 6.

An important part of the trial court's duty in instructing the jury is to describe and define each element of the offense charged. *State v. Clark*, 452 S.W.3d 268, 295 (Tenn. 2014) (citing *Faulkner*, 154 S.W.3d at 58). We do not review a particular jury instruction in isolation; rather the instruction is reviewed in the context of the entire jury charge. "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Perrier*, 536 S.W.3d 388, 403 (Tenn. 2017) (quoting *Faulkner*, 154 S.W.3d at 58).

The failure to properly instruct the jury on a material element of an offense is a non-structural constitutional error requiring a reversal of the corresponding conviction unless the State can prove beyond a reasonable doubt that the error was harmless. *Clark*, 452 S.W.3d at 295; *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008). The test to determine whether a non-structural constitutional error is harmless is "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Rodriguez*, 254 S.W.3d at 371 (citations omitted).

Second degree murder is defined as the "knowing killing of another." T.C.A. § 39-13-210(a)(1). "Knowing" is defined accordingly:

> "Knowing" means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result[.]

*Id.* § 39-11-106(a)(23).

Second degree murder, like first degree premeditated murder, is a result-of-conduct offense. *State v. Rogers*, 188 S.W.3d 593, 615 (Tenn. 2006) (citing *Faulkner*, 154 S.W.3d at 58); *see also State v. Page*, 81 S.W.3d 781, 787-88 (Tenn. Crim. App. 2002) (holding that "a knowing second degree murder is strictly a 'result-of-conduct' offense" for which the proof must establish that the defendant knew that his conduct was reasonably certain to cause death). Thus, as a result-of-conduct offense, the nature of the conduct causing the result is inconsequential and should not be included in defining "knowingly" for second degree murder. *Rogers*, 188 S.W.3d at 615 (citing *Faulkner*, 154 S.W.3d at 58).

However, the inclusion of the nature-of-conduct and circumstances-surrounding-conduct language in defining "knowingly" while erroneous, did not rise to "an error of constitutional dimension when the instruction also include[d] the correct result-of-conduct definition." *Faulkner*, 188 S.W.3d at 58-59 (finding harmless error and therefore no plain error with the inclusion of the nature-of-conduct language as definition of intentionally and knowingly where the jury's verdict of premeditated murder necessitated a finding that the defendant acted with the specific intent to cause the victim's death in capital murder case); *Rogers*, 188 S.W.3d at 615-16 (reaching the same result as *Faulkner* and finding no plain error in the trial court's instruction of nature-of-conduct and circumstances-surrounding-conduct and result-of-conduct language in the definition of knowingly in a capital murder case); *State v. Carter*, No. E2006-01265-CCA-R3-CD, 2008 WL 960152, at *9-11 (Tenn. Crim. App. Apr. 9, 2008) (concluding that erroneous "superfluous" inclusion of the nature-of-circumstances language in the jury charge for second degree murder was harmless error).

The heading of the second degree murder instruction in this case describes the offense in the parenthetical as a "knowing killing of another" and instructs the jury that to find Defendant guilty the State must have proven beyond a reasonable doubt that Defendant unlawfully killed the victim and that Defendant acted knowingly. Also included in the instruction is the language on transferred intent explaining that Defendant's "conscious objective need not be to kill a specific victim." If Defendant intended to cause the death of another person, even if not the intended victim, that would also be second degree murder. However, in a separate section of the jury instructions, the trial court provided an additional definition of "knowingly" which included both the nature-of-conduct or circumstances-surrounding-conduct language and the result-of-conduct language. The trial court's instruction in the stand-alone definition of "knowingly" was erroneous because it did not confine the definition "to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Thus, we must next examine the effect of the error. An erroneous jury charge constitutes a non-structural constitutional error requiring a reversal of the corresponding conviction unless the State can prove beyond a reasonable doubt that the error was harmless. *Clark*, 452 S.W.3d at 295; *Rodriguez*, 254 S.W.3d at 371.

- 20 -

Unlike the jury charge in *Page*, the trial court here did not instruct the jury that they had to find that Defendant acted knowingly as to either the nature of his conduct *or* the result of his conduct to find the defendant guilty of second degree murder. 81 S.W.3d at 786. Rather, the trial court's later definition of "knowingly" in this case could suggest that, for a jury to find that Defendant acted knowingly, the jury must find that he was aware of his conduct or aware of the circumstances *and* aware that the conduct was reasonably certain to cause a certain result as to each material element of the offense. This instruction did not lessen the State's burden of proving every element of second degree murder beyond a reasonable doubt. *Faulkner*, 154 S.W.3d at 58-59 (rejecting *Page*'s holding that a jury instruction on knowingly encompassing both definitions for knowingly reduced the State's burden of proof); *Rogers*, 188 S.W.3d 615-16 (reaching the same conclusion in *Faulkner* including the rejection of the defendant's argument that the jury charge lessened the State's burden of proof). Indeed, the definition of "knowingly" provided a two-prong definition of the term, resulting in an added burden of proof upon the State. *See State v. Ducker*, No. 01C01-9704-CC-00143, 1999 WL 160981, at *16-18 (Tenn. Crim. App. Mar. 25, 1999), *aff'd on other grounds* 27 S.W.3d 889 (Tenn. 2000).

Defendant contends that the superfluous language in the definition of "knowingly" caused the jury to be confused resulting in prejudicial error. He argues that the facts in this case support the scenario mentioned in *Faulkner*, where "potential prejudice" could occur from an erroneous instruction including both definitions of knowingly where "a defendant acted purposefully, but intended no harm." 154 S.W.3d at 59 (quoting *State v. Rothacher*, 901 P.2d 82, 87 (Mont. 1995)). Defendant contends that "[n]o reasonable jury could have found beyond a reasonable doubt that [he] was *reasonably certain* to cause the death of the victim" because his intent was to scare, not to harm the victim. (emphasis in original). He points out that he did not know the layout of the house because he had never been to the victim's house and that he was unaware the victim or anyone else was in the house, except perhaps the victim's father, but no bullet fragments were found at or near the front door. He adds that only five of the fifteen rounds were found in the house and of those five rounds, only three penetrated the interior of the house.

In continuing our analysis of this issue for harmless error, we are reminded that an error "is not determined by the existence of sufficient evidence to affirm a conviction or by the belief that the jury rendered the correct verdict." *State v. Brown*, 311 S.W.3d 422, 434 (Tenn. 2010) (citing *Rodriguez*, 254 S.W.3d at 372). Instead, "the crucial consideration is what impact the error may reasonably be taken to have had on the jury's decision-making." *Rodriguez*, 254 S.W.3d at 372. To that end, this court must "conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury." *State v. Allen*, 69 S.W.3d 181, 191 (Tenn. 2002).

Applying the above standard to the present case, we conclude that the definition of "knowingly" in the jury instructions was not prejudicial, because the higher threshold of knowing the conduct was reasonably certain to cause the result was still met. The State's evidence established that Defendant fired fifteen rounds from a semi-automatic handgun in a rapid-fire manner aimed at the victim's house from a distance of 49.41 yards while parked in the area of the cul-de-sac closest to the victim's house. Bullet fragments or entries found at the scene were found in the victim's bathroom where the victim was shot and killed, in the bedroom directly beneath the victim's bathroom, in a shingle located above the victim's bathroom, and in the attic. Given the number of bullets fired, the location from which they were shot, and the number and location of the bullet strikes, there was proof for a jury to conclude that Defendant was aware that his conduct, firing a semi-automatic gun repeatedly at the victim's house, was reasonably certain to result in the victim's death. Thus, like the facts in *Rothacher* and *Faulkner*, the facts here do not support Defendant's argument that he intended no harm. 901 P.2d at 87; 154 S.W.3d at 60-61.

Additionally, the State did not rely on the superfluous language in the "knowingly" definition during its closing argument. Rather, the State argued that Defendant was guilty of first degree murder, contending that Defendant intended to cause the victim's death. In other words, the State focused on the result of Defendant's conduct as required to prove first degree murder and second degree murder. *Clark*, 452 S.W.3d at 299 (holding harmless the trial court's erroneous instruction on the three mental states for aggravated sexual battery where the State argued that all of the defendant's conduct was intentional, not reckless or knowing and offered no proof that the defendant's behavior conduct of sexually touching the victim was anything but intentional); c*f. Page*, 81 S.W.3d at 789-90 (reversing for error on the trial court's instruction on the nature of conduct where the State argued that the nature of the defendant's conduct and the circumstances surrounding the conduct was required to prove the defendant acted knowingly).

Consistent with the defense theory, Defendant argued that the killing was reckless, not premeditated. Defendant also argued against second degree murder as a potential lesser-included conviction by quoting the correct result of conduct definition of "knowingly."

In this case, the jury was given an opportunity to reach a decision on the lesser-included offenses of first degree murder. In rendering its verdict, the jury rejected the State's argument that Defendant acted with a premeditated mental state in killing the victim. Based on the evidence, the theories of the parties, the jury instructions, and the verdict, we conclude that the surplus language in the jury instruction on the definition of "knowingly" was harmless beyond a reasonable doubt. Defendant is not entitled to relief.

## II. Sufficiency of the Evidence

Defendant contends the evidence does not support his conviction for second degree murder because "the record was devoid of any facts" that he knowingly killed the victim. The State contends that "the strongest legitimate view of the evidence supports a finding that Defendant was reasonably certain his conduct would result in the killing of another." We agree with the State.

When a defendant challenges the sufficiency of the evidence, this court is obliged to review that claim according to certain well-settled principles. "[A] guilty verdict 'removes the presumption of innocence and replaces it with a presumption of guilt.'" *State v. Reynolds*, 635 S.W.3d 893, 914 (Tenn. 2021) (quoting *State v. Gentry*, 538 S.W.3d 413, 420 (Tenn. 2017)); *State v. Allison*, 618 S.W.3d 24, 33 (Tenn. 2021). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *Allison*, 618 S.W.3d at 33; *State v. Jones*, 589 S.W.3d 747, 760 (Tenn. 2019). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *Allison*, 618 S.W.3d at 33-34 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also* Tenn. R. App. P. 13(e).

On appeal, "all reasonable and legitimate inferences from the evidence must be drawn in favor of the prosecution and all countervailing evidence discarded." *State v. Weems*, 619 S.W.3d 208, 221 (Tenn. 2021) (holding that the same standard of review applies when examining the sufficiency of the evidence and a motion for judgment of acquittal). As such, this court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017). Questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *Allison*, 618 S.W.3d at 34; *Jones*, 589 S.W.3d at 760. "This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).

As mentioned in the jury instruction issue, second degree murder is the "knowing killing of another." T.C.A. § 39-13-210(a)(1). A person acts knowingly "with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result[.]" *Id.* § 39-11-106(a)(23). Whether a defendant acted "knowingly" in killing another is a question of fact to be addressed by the jury. *Brown*, 311 S.W.3d at 432 (citations omitted). "A person can act knowingly irrespective of his or her desire that the conduct or result will occur." *State v. Gray*, 960 S.W.2d 598, 604 (Tenn. Crim. App. 1997) (citing *State v. Rutherford*, 876 S.W.2d 118, 120-21 (Tenn. Crim. App.

1993)). "To sustain a finding that a defendant acted knowingly, the State is not required to prove that the defendant wished to cause his victim's death but only that the defendant knew that his or her actions were reasonably certain to cause the victim's death." *Brown*, 311 S.W.3d at 432. In assessing the defendant's intent, the jury may rely on "the character of the assault, the nature of the act and [on] all the circumstances of the case in evidence." *State v. Inlow*, 52 S.W.3d 101, 105 (Tenn. Crim. App. 2000) (citing *State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)).

Defendant rehashes the same argument he made on the jury instruction issue - that he did not know the victim, had not communicated with the victim, was unaware of the layout of the victim's house, and did not know in fact that the victim was home. He adds that he fired the gun from just under fifty yards away making it unlikely that he was reasonably certain to believe that his actions would result in the victim's death.

However, by their guilty verdict, the jury found that Defendant acted knowingly when he drove from Nashville to Brentwood in the middle of the night, armed with a .45 caliber semi-automatic gun with an extended magazine, and fired fifteen times into an occupied dwelling in a populated neighborhood. Defendant's act of aiming and firing fifteen times toward a house where people could reasonably be expected to be present, supported the inference that he was aware of the potentially fatal consequence of his action. *State v. Ely*, 48 S.W.3d 710, 723-24 (Tenn. 2001) (concluding that the defendant's conduct of firing a gun in the general direction of a van containing three people showed the defendant was aware of being reasonably certain of killing the victim sufficient to support second degree murder).

The evidence in the light most favorable to the State shows that Defendant and Co-defendant Bronston went to the victim's house expecting him to be there. Co-defendant Bronston accused the victim of a kidnapping and human trafficking plot. She focused her delusions and ire on him alone, tracked down his address, and with Defendant drove to that address. Once there, Defendant posed with the gun in an image that was texted to the victim along with the ominous message, "This your house[?]" The image and text message were sent just before Defendant fired the gun fifteen times.

Furthermore, the circumstances were such that Defendant should have known that the house was occupied. Defendant, by his own admission, was there to scare the person Co-defendant Bronston identified as the man who was in cahoots with the police and a criminal gang to kidnap her and force her into sexual slavery. He went to the victim's house with a .45 caliber gun. Mr. Cable saw the vehicle lights outside the home as he went through the house turning out the lights for the evening. The only lights left on were in the victim's room and his parents' room, two of the rooms directly hit by Defendant's shots.

- 24 -

It was also a Monday night at 11 p.m.[4]  These factors support the reasonable conclusion that the house was occupied.  Thus, even if the jury had accredited Defendant's theory that he intended only to scare the victim, a reasonable jury could conclude that Defendant was aware that firing a lethal weapon fifteen times, aimed at an occupied dwelling would result in a killing.  Because we will not second-guess the jury's determination, Defendant is not entitled to relief.  Therefore, we find that there was sufficient evidence to support the Defendant's conviction beyond a reasonable doubt.

### III.     Sentencing – Enhancement Factor

Defendant contends the trial court abused its discretion by applying enhancement factor ten in determining the length of his sentences because the factor is an essential element of his convicted offenses.  The State responds that the trial court properly exercised its discretion because the trial court imposed a within-range sentence, consistent with the purposes and principles of sentencing, and its application of enhancement factor ten is supported by the record.

When a defendant challenges the length or range of a sentence, this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness.  *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012).  This presumption applies to "within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act."  *Id*. at 707.  The presumption is overcome when the record demonstrates that the trial court's decision is contrary to the purposes and principles of sentencing.  *State v. Sihapanya*, 516 S.W.3d 473, 476 (Tenn. 2014) (citing *Bise*, 380 S.W.3d at 706); *see* T.C.A. § 40-35-401(d).  The party challenging the sentence on appeal bears the burden of overcoming the presumption.  T.C.A. § 40-35-401, Sent'g Comm'n Comment.

"In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the [] advisory sentencing guidelines," including the enhancement and mitigating factors.  *Id.* §§ 40-35-210(c); -113; -114.  The weighing of various enhancement and mitigating factors is within the sound discretion of the trial court and is no longer grounds for appeal.  *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008).  "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the [Sentencing Act]."  *Bise*, 380 S.W.3d at 706.  Indeed, this court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute."  *Bise*, 380 S.W.3d at 709-10.

---

[4] The victim's birthday, December 3, 2018, was a Monday.

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant made on the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the pre-sentence report. T.C.A. §§ 40-35-102, -103, - 210(b); *see also Bise*, 380 S.W.3d at 697-98. The trial court must also consider a defendant's potential or lack of potential for rehabilitation or treatment. *See* T.C.A. § 40-35-103(5).

Here, the trial court sentenced Defendant to sentences within the proper range of punishment. Defendant, a Range I Standard Offender, was sentenced to twenty-five years for second degree murder, a Class A felony; *id.* §§ 39-13-210(c)(1), 40-35-112(a)(1) (fifteen to twenty-five years); five years for reckless endangerment by discharging a firearm into an occupied habitation, a Class C felony; *id.* §§ 39-13-103(b)(3); 40-35-112(a)(3) (three to six years); and two years on each of the three reckless endangerment with a deadly weapon convictions, a Class E felony; *id.* §§ 39-13-103(b)(2); 40-35-112(a)(5) (one to two years).

In applying enhancement factor ten, the trial court made detailed findings:

As for enhancement factor number [ten]. That's the factor that states that the defendant had no hesitation about committing a crime when the risk to human life was high, the Court finds that that factor does apply. [Defendant] fired [fifteen] shots into an occupied dwelling. The shots that did hit the house, hit the spots where lights were on which was the light of the master bedroom downstairs, Mr. and Ms. Cable[']s bedroom, as well as the room in which [the victim] was standing; those were the only two rooms in the house with lights on. So not[ ]withstanding the light issue, firing [fifteen] shots into any dwelling whether you know it's occupied or not – a house in a neighborhood on a cul[-]de[-]sac at I believe was 11:30 at night. The Court finds that enhancement factor number [ten] applies.

Defendant argues that the trial court misapplied enhancement factor ten because it is "inherent" in second degree murder. Defendant relies solely on *State v. Belser*, 945 S.W.2d 776 (Tenn. Crim. App. 1996). In *Belser*, this court agreed with the defendant that enhancement factor ten could not be used to determine his sentence for second degree murder unless the State proved that the defendant "demonstrated a culpability distinct from

- 26 -

and appreciably greater than that incident to the offense for which he was convicted." 945 S.W.2d at 792 (quoting *State v. Jones*, 883 S.W.2d 597, 603 (Tenn. 1994), *superseded by statute on other grounds as stated by State v. Carico*, 968 S.W.2d 280, 288-89 (Tenn. 1998)).

We note that "[a]lthough [the high risk to human life] factor . . . is inherent in every homicide case relative to the victim, the trial court may consider this factor when the defendant endangers the lives of people other than the victim." *State v. Kelley*, 34 S.W.3d 471, 480 (Tenn. Crim. App. 2000) (affirming application of enhancement factor ten to a second degree murder sentence where the defendant fired three shots into a car containing the victim and another passenger who was not the victim of the second degree murder count in the indictment); *State v. Reid*, 91 S.W.3d 247, appx. 312 (Tenn. 2002) (noting in a double-murder capital case that enhancement factor ten may be applied to an especially aggravated robbery sentence where the defendant created a high risk to the life of the victim not named in the indictment for especially aggravated robbery and in fact resulted in her death).

Here, enhancement factor ten was properly applicable to the second degree murder conviction of the victim because Defendant's act of firing a lethal weapon multiple times into the victim's house created a high risk of harm to the victim's mother, father, and younger brother. *Kelley*, 34 S.W.3d at 480; *Reid*, 91 S.W.3d at appx. 312. We note however, that enhancement factor ten is inapplicable to the three reckless endangerment offenses charged in counts five, six, and seven because the victim's father, mother, and brother were named as victims in the indictment relative to those counts. *Id.*; *Kelley*, 34 S.W.3d at 480. We also conclude enhancement factor ten is inapplicable to the reckless endangerment of discharging a weapon into a habitation in count four because the risk to human life is an element of reckless endangerment which occurs when a person is placed in "imminent danger of death or serious bodily injury." T.C.A. 39-13-103(a).

Nevertheless, the misapplication of enhancement ten factor to the four reckless endangerment convictions does not remove the presumption of reasonableness of the trial court's sentencing decision. *See Bise*, 380 S.W.3d at 706-08. The trial court imposed within-range sentences for each of the convictions, and those sentences are consistent with the purposes and principles of sentencing. The sentences are affirmed.

IV.    Partial Consecutive Sentencing

Defendant contends the trial court failed to make findings to impose consecutive sentences based upon him being a dangerous offender. He insists that this court should review the sentence de novo and align his sentences concurrently. The State concedes that the trial court failed to make the requisite findings and agrees that the record is sufficient

to support de novo review by this court but maintains that the consecutive alignment of the sentences should be affirmed. We agree with the parties that the partial consecutive alignment of Defendant's sentences is not presumptively reasonable. However, we agree with the State that the trial court's decision should stand upon de novo review.

The standard of review adopted in *Bise* applies to decisions by trial courts regarding consecutive sentencing. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). This means that the reviewing court will give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" *Id.* at 861. As relevant to this case, the trial court may order sentences to run consecutively if it finds by a preponderance of the evidence that a defendant is "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high[.]" T.C.A. § 40-35-115(b)(4). Before a trial court may impose consecutive sentences on the basis that a defendant is a dangerous offender, the trial court must find that consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct. *State v. Wilkerson*, 905 S.W.2d 933, 937-39 (Tenn. 1995). "The adoption of the abuse of discretion standard with the presumption of reasonableness has not eliminated this requirement." *Pollard*, 432 S.W.3d at 863. In order to limit the use of the "dangerous offender" category to cases where it is warranted, the trial court must make specific findings about "particular facts" which show that the *Wilkerson* factors apply to the defendant. *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

When imposing consecutive sentences, the trial court must still consider the general sentencing principles that each sentence imposed shall be "justly deserved in relation to the seriousness of the offense," "no greater than that deserved for the offense committed," and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. §§ 40-35-102(1), -103(2), -103(4); *State v. Imfield*, 70 S.W.3d 698, 708 (Tenn. 2002). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Pollard*, 432 S.W.3d at 862 (citing Tenn. R. Crim. P. 32(c)(1); *Bise*, 380 S.W.3d at 705).

Here, the record reflects that the trial court failed to make findings and cite specific facts from the case to support the imposition of partial consecutive sentences on the dangerous offender factor. When faced with a record with no findings by the trial court, this court has two options: "(1) conduct a de novo review to determine whether there is an adequate basis for imposing consecutive sentences; or (2) remand for the trial court to consider the requisite factors in determining whether to impose consecutive sentences." *Pollard*, 432 S.W.3d at 864 (citing *Bise*, 380 S.W.3d at 705 & n.41). Because the record

here is sufficient for this court to conduct a de novo review, we will determine whether there is an adequate basis for the trial court's order of partial consecutive sentences. *State v. Mark*, No. M2014-00651-CCA-R3-CD, 2015 WL 4720038, at *39 (Tenn. Crim. App. Aug. 10, 2015) (affirming dangerous offender factor in imposing consecutive sentence upon de novo review); *State v. Turner*, No. W2022-01389-CCA-R3-CD, 2024 WL 808713, at *8-9 (Tenn. Crim. App. Feb. 27, 2024), *perm. app. denied* (Tenn. June 21, 2024).

Based on the record before us, we are satisfied that the aggregate sentence is "reasonably related to the severity of the offenses." *Pollard*, 432 S.W.3d at 863 (citation omitted). Spurred by the delusions of Co-defendant Bronston about the victim, Defendant took matters into his own hands, traveled from as far away as Tullahoma to the victim's home in a populated neighborhood in Brentwood. Defendant maintained that there was no evidence that he was aware that someone would be in the home. Yet, Co-defendant Bronston's text messages to the victim about his family indicated otherwise. Additionally, as Defendant and Co-defendant Bronston sat in the car outside the victim's house, the victim's father went through the house turning off lights. When Defendant began shooting, lights were still on in two of the rooms into which he shot. Using a semi-automatic handgun with an extended magazine, Defendant fired fifteen rounds into the victim's house in the middle of the night killing the victim. *See Turner*, 2024 WL 808713, at *9 (concluding that twenty-seven-year sentence was reasonably related to the severity of the offenses where the defendant fired at least eight shots toward the home where his children and their mother lived, killing two people). The medical testimony revealed that although only one bullet struck the victim, the damage caused by the bullet was so significant that the victim was not expected to survive even with medical attention.

We also conclude that the aggregate sentence is "necessary in order to protect the public from further criminal acts." As discussed above, Defendant used a semi-automatic weapon to fire fifteen shots into an occupied home demonstrating his conscious lack of concern or indifference to the high probability of a potential fatality. Moreover, Defendant fled the scene without rendering aid and discarded the handgun. Defendant's mother testified that Defendant showed no remorse when he told her that he had shot and killed the victim. He then stole his grandmother's car and fled to Arizona with Co-defendant Bronston. The record supports the need to protect the public from further criminal acts by Defendant. Defendant is not entitled to relief.

**Conclusion**

Based on the foregoing, the judgments of the trial court are affirmed.


_____
JILL BARTEE AYERS, JUDGE